FILED
04/08/2019
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 15, 2018 Session

## STATE OF TENNESSEE v. TIMOTHY LERON BROWN

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-365      Steve R. Dozier, Judge**

_____

**No. M2017-00904-CCA-R3-CD**
_____

The Defendant, Timothy Leron Brown, was convicted of first degree premeditated murder, unlawful possession of a handgun by a convicted felon, three counts of especially aggravated kidnapping, attempted first degree murder, especially aggravated robbery, employment of a firearm during the commission of a dangerous felony while having prior felony convictions, theft of property valued less than $500, and failure to appear. The Defendant received an effective sentence of life plus thirty-one years. On appeal, the Defendant challenges (1) the sufficiency of the evidence of his convictions for first degree premeditated murder and theft, (2) the trial court's denial of his motion to sever the offenses for trial, (3) the admission of bad act evidence pursuant to Tennessee Rule of Evidence 404(b), (4) the admission of evidence that the murder victim was a police informant, (5) the trial court's denial of his motion to suppress his cell phone records obtained pursuant to a judicial subpoena, (6) the trial court's denial of his motion to exclude cell tower evidence as unreliable expert proof, (7) the trial court's denial of his motion to suppress evidence obtained from the search of his cell phone, (8) the admission of text messages from the Defendant's cell phone, (9) the admission of photographs from the Defendant's cell phone, and (10) the trial court's imposition of partial consecutive sentences. We conclude that the evidence is insufficient to support the Defendant's theft conviction, and we, therefore, reverse and dismiss the theft conviction. We also conclude that the trial court erred in failing to sever the offenses and that the error was not harmless as to the Defendant's conviction for first degree premeditated murder. Accordingly, we reverse the Defendant's conviction for first degree premeditated murder and remand the case to the trial court for a new trial. We otherwise affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Aisha McWeay, Deputy Public Defender; and Jeffrey A. DeVasher (on appeal) and Jonathan Wing and Kathryn Hansel (at trial), Assistant Public Defenders, for the appellant, Timothy Leron Brown.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Pamela Anderson, J. Wesley King, and Ana Escobar, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

The evidence presented at trial established that on August 9, 2012, Mr. Chijoke Ike was shot multiple times, and police officers found Mr. Ike's body in a wooded area five days later on August 14. The Defendant and his co-defendant, Aaron Eugene Hall, Jr., were charged with the first degree premeditated murder of Mr. Ike.

On August 9, shortly after Mr. Ike was shot, the Defendant contacted Mr. Alan Beverly and arranged to purchase drugs from him. When Mr. Beverly arrived at the agreed-upon location, the Defendant and Mr. Keandre March abducted him at gunpoint and drove away in Mr. Beverly's car. As the Defendant was driving, Mr. Beverly offered the Defendant and Mr. March $30,000 in exchange for his freedom. Mr. Beverly contacted his brother, whom the Defendant instructed to meet them at a bowling alley. While en route, Mr. Beverly and Mr. March fought over the guns; all three men were shot during the struggle; and Mr. March died as a result of his gunshot wounds. The Defendant wrecked the car, fled the scene, and later was found by police officers hiding in a nearby dumpster. A gun found in the car was determined to be the gun used to shoot Mr. Ike. The gun had been taken from Mrs. Brenda McGinnis's apartment during a burglary in April 2011. The Defendant was due to appear in court on unrelated charges on August 9 but failed to appear.

In addition to the first degree premeditated murder of Mr. Ike, the Defendant was charged under the same indictment with unlawful possession of a handgun by a convicted felon, especially aggravated kidnapping of Mr. Beverly resulting in serious bodily injury, especially aggravated kidnapping of Mr. Beverly in order to hold Mr. Beverly for ransom or reward, especially aggravated kidnapping of Mr. Beverly accomplished with a deadly

weapon, attempted first degree murder of Mr. Beverly, especially aggravated robbery of Mr. Beverly, employment of a firearm during the commission of a dangerous felony while having prior felony convictions, theft of property of Mrs. McGinnis valued less than $500, and failure to appear on a felony charge. Prior to trial, the trial court severed Mr. Hall's trial from the Defendant's trial but denied the Defendant's motion to sever the offenses. On the morning of trial, the defense announced that the Defendant waived a jury determination of the existence of his prior felony convictions for the purposes of the firearm charges and allowed the trial court to make that decision at a later time.

The State's theory at trial was that the Defendant committed the offenses against Mr. Ike because Mr. Ike was a confidential informant for the police. The State also maintained that the Defendant committed the offenses against Mr. Beverly because the Defendant mistakenly believed that Mr. Beverly was also a confidential informant for the police. The State argued that the Defendant utilized a stolen firearm during the commission of the offenses and that he failed to attend a court appearance on a separate charge in order to commit the offenses.

Ms. Uloma Ike, Mr. Ike's sister, testified that Mr. Ike was twenty-eight years old when he died and drove a blue four-door Chevrolet Impala. He had been shot a few years prior to his death, and the bullet remained in his hip. Mr. Ike's family members last saw him approximately one week before his body was found. When Mr. Ike's family was unable to contact him, they filed a missing person's report on Monday, August 13, and Mr. Ike's body was located the following day.

Ms. Shatoya Cartwright was visiting her grandparents' home located near Mr. Hall's home in Nashville during the evening hours of August 9, 2012. Ms. Cartwright testified that as she and her grandmother were sitting on her grandparents' porch, she saw a navy car, which was later identified as Mr. Ike's car, park near Mr. Hall's home. Mr. Hall came out of his house and entered the car on the passenger side. A few minutes later, Ms. Cartwright saw a man running down the street and toward the car while holding a gun. Ms. Cartwright did not recall what the gun looked like and was unable to offer a description of the gunman or determine his race. She did not recall seeing Mr. Hall exit the car.

Ms. Cartwright helped her grandmother inside the home as quickly as she could. Once inside, Ms. Cartwright heard gunshots. She was unable to recall the number of gunshots fired but stated that she heard more than one. She then saw a silver sports utility vehicle ("SUV") quickly drive away from the scene and toward the general direction from which the gunman came.

At approximately 7:00 p.m. on August 9, Metropolitan Nashville Police Officer Dustin Chester responded to a report of shots fired in the area of 33rd Avenue and Felicia Street.  Upon arriving, he observed a blue Chevrolet Impala parked on the street.  After Officer Chester spoke to a woman at the scene, he and other officers began searching the area for a possible suspect or victim.  Sergeant John Robinson saw someone running into a nearby wooded area, and officers began to search the area.  The wooded area was thick and difficult to walk through, and the officers were unable to locate anyone in the area.  During the search, neither Officer Chester nor Sergeant Robinson observed any projectiles on the ground, and Officer Chester did not observe any evidence indicating that a shooting had occurred.

During the early morning hours of August 14, 2012, Sergeant John Pepper went to the scene of the shooting while investigating a report of a missing person.  He was unable to locate Mr. Ike, the missing person, but Mr. Ike's car was still in the area.  Sergeant Pepper had the car towed.  He did not search the wooded area at that time because it was dark, the wooded area was thick, and he did not want to risk destroying any evidence.  Rather, officers waited until daylight to conduct an additional search.

Detective James Arendall and Detective Daniel Sadderfield assisted in searching the area for Mr. Ike later that day.  While they were driving down 33rd Avenue and toward Felicia Street with their windows down, Detective Arendall smelled a foul odor and decided to check a wooded area.  Detective Arendall found a deceased man, who was later identified as Mr. Ike, lying face down in some bushes in the wooded area.  Mr. Ike was not wearing a shirt but was wearing shorts and tennis shoes.  Detective Arendall and other officers sealed off the area and contacted the crime scene investigation unit.

Detective Arendall saw a spent round in the street and notified a crime scene investigator to collect it.  Crime scene investigator Charles Linville collected the projectile from the road and acknowledged on cross-examination that the projectile could have been moved by water from a recent storm. He also collected a white iPhone that was underneath Mr. Ike's body and noted that Mr. Ike had money clutched in his right hand.

Crime scene investigator Lynn Mace processed Mr. Ike's Chevrolet Impala and collected a package of cigarettes, a Cricket Samsung cell phone, a Sprite bottle, and a cigarette butt from inside the car.  She also lifted latent prints from the car, swabbed the car for DNA, and vacuumed materials.  Proof later presented at trial revealed that the evidence collected from the car was not submitted to the Tennessee Bureau of Investigation ("TBI") for testing.

Dr. David Zimmerman, a forensic pathologist, was accepted by the trial court as an expert in forensic pathology.  He conducted the autopsy of Mr. Ike.  Mr. Ike's body

was in a state of decomposition, and he was identified by his fingerprints. Dr. Zimmerman concluded that Mr. Ike's cause of death was a gunshot wound to his chest and that his manner of death was homicide. Dr. Zimmerman also concluded that the condition of Mr. Ike's body was consistent with August 9 being his actual date of death.

Dr. Zimmerman testified that he initially determined that Mr. Ike was shot five times from indeterminate ranges. A bullet entered Mr. Ike's right arm, fractured his right humerus bone between his elbow and shoulder, exited his upper right arm, reentered on the lateral side of his chest, and exited on the right side of his back. A second bullet entered his right shoulder and exited his right upper back, injuring the skeletal muscle of his right shoulder. A third bullet entered the left side of his chest, penetrated his aorta, fractured a vertebra, and exited through the right side of his back. Dr. Zimmerman described Mr. Ike's injury from this bullet as "devastating" and said that Mr. Ike's death was "fairly immediate." A fourth bullet entered the left side of Mr. Ike's chest, fractured a rib, and exited through the left side of his back. A fifth bullet entered the side of his left forearm, injured his skeletal muscle, and exited on the side of his left forearm.

Dr. Zimmerman noted that he recovered a projectile from a prior gunshot wound from Mr. Ike's right hip. Dr. Zimmerman also recovered a projectile in the muscle on the right side of Mr. Ike's neck, which he initially believed was from a prior gunshot wound because he was unable to see a wound track associated with the projectile. The TBI analyzed the projectile and determined that the projectile appeared to have been fired from the same firearm as another projectile found at the scene. As a result, Dr. Zimmerman amended his report to conclude that the projectile in Mr. Ike's neck probably occurred at the same time as the other five gunshot wounds. He stated that the side of the projectile was slightly corroded, which was a factor that led him to believe that the gunshot wound resulting from the projectile occurred at a prior date. Dr. Zimmerman explained that Mr. Ike's body was in a decomposed state and that the projectile was located in tough tissue. He said it appeared that the projectile entered an artery and traveled up to Mr. Ike's neck. He noted that there was no bleeding in the tissue or a wound track leading up to that projectile. He also noted that areas of Mr. Ike's left check, face, and neck were partially skeletonized. The left side of his chest had an area of insect activity, and Dr. Zimmerman could not determine whether a gunshot entry wound was present.

On cross-examination, Dr. Zimmerman testified that Mr. Ike could have lived for a brief period of time after receiving the gunshot wound that penetrated his heart and that Mr. Ike could have run or moved about for a short period after receiving the injury.

Investigator Andrae Starling, who was formerly assigned to the specialized investigation division, testified that he utilized Mr. Ike as a confidential informant.

Investigator Starling stated that records regarding confidential informants were maintained in a vault in the specialized investigation division to ensure that only the officer who was working with the informant and the officer's supervisors knew the informant's identity. Another confidential informant provided Investigator Starling with information regarding Mr. Ike. Following an investigation, Mr. Ike was arrested on felony marijuana charges and subsequently agreed to be a confidential informant. Mr. Ike participated in controlled purchases of drugs for the police, and officers obtained a search warrant for a home as a result of the information that Mr. Ike provided. During the execution of the search warrant in June 2012, officers recovered drugs, a weapon, drug paraphernalia, and a gang ledger. Three people were arrested, and their cases were resolved in general sessions court in July 2012.

On cross-examination, Investigator Starling testified that while investigating Mr. Ike, he observed Mr. Ike sell marijuana on four occasions, and he arrested Mr. Ike following the fourth transaction. Mr. Ike was selling a quarter of a pound to two pounds of marijuana during each transaction, and he was arrested in March 2012 for possession of marijuana for resale in a drug-free school zone.

Investigator Starling did not recall Mr. Ike ever mentioning the Defendant or Mr. March to him. Investigator Starling was unaware of any connection between the Defendant and the arrests of the three individuals as a result of the search warrant. He agreed that his investigation did not reveal any connection between the Defendant and the home where the search occurred. The Defendant was not found in the home and was not arrested when the search warrant was executed. Investigator Starling acknowledged that he had no information suggesting that the Defendant knew or had any connection to those who were arrested.

Because the cases against the three individuals who were arrested were resolved, Mr. Ike never had to go to court or testify against them. Investigator Starling did not include Mr. Ike's name on the search warrant or any paperwork and did not tell anyone outside of law enforcement that Mr. Ike was a confidential informant. Investigator Starling had no information that the three individuals who were arrested or anyone else outside of law enforcement knew that Mr. Ike was a confidential informant. Investigator Starling acknowledged that he did everything that he could to protect Mr. Ike's identity as a confidential informant.

On redirect examination, Investigator Starling testified that despite the security and safeguards, the identities of confidential informants are occasionally discovered. He agreed that he had no way of knowing whether or not Mr. Ike's status as a confidential informant was discovered. On recross examination, Investigator Starling stated that

following the June arrests, Mr. Ike never mentioned any concern about his identity being discovered.

Mr. Alan Beverly testified that on August 9, 2012, the Defendant called him and asked to purchase marijuana for $100. They agreed to meet at Sunnyview Court, and Mr. Beverly arrived in his Chevrolet Malibu between 4:00 and 6:00 p.m. Mr. Beverly saw the Defendant in a car with a passenger. After Mr. Beverly parked, a man named "Justin" entered his car and sat in the passenger seat. As Mr. Beverly was speaking with Justin, he saw the Defendant walking up from his rear view mirror. The Defendant sat in the backseat and produced a black and silver gun, and Justin fled. The Defendant told a man later identified as Mr. March to "come on," and Mr. March got in the backseat with the Defendant. The Defendant used Mr. March's nickname, "Ke-Thang," when addressing him, and Mr. Beverly stated that he had not met Mr. March previously. Mr. March was holding a black and brown gun.

Mr. Beverly testified that the Defendant said Mr. Beverly had "snitched" on his cousin and that Mr. Beverly was going to die. Mr. Beverly denied at trial that he was a confidential informant or that he had "snitched" on the Defendant's cousin. Mr. Beverly stated that Mr. March told him that they had killed two people already that day. When Mr. Beverly refused to drive to a location as instructed by the Defendant, the Defendant gave his gun to Mr. March and drove the car while Mr. Beverly sat in the front passenger seat. Mr. March was sitting in the middle of the backseat and holding two guns.

Mr. Beverly stated that he told the Defendant that he could pay them $30,000. Mr. Beverly explained that while he did not have the money, he told the Defendant that he did in an effort to have time to alert someone to the abduction. Mr. Beverly called his brother, Mr. Michael Wilson, and told him that he needed $30,000 because he had been kidnapped. The Defendant spoke to Mr. Wilson and instructed him to meet them at a bowling alley in Madison with the money, and the Defendant proceeded to turn around in the parking lot of a CVS Pharmacy. At some point, Mr. March hit Mr. Beverly on the forehead with a gun.

When Mr. Beverly saw Mr. March looking out the window, Mr. Beverly jumped into the backseat, and they wrestled over the guns. Mr. Beverly believed he bit Mr. March's ear during the struggle. A gun was fired several times, and Mr. Beverly was shot in his leg. The Defendant stopped the car, got out, pried Mr. Beverly's hands off the black and brown gun, and shot Mr. Beverly in his stomach. Mr. Beverly acted as if he was "down." The Defendant got back into the car and began driving down Gallatin Road toward the Rivergate Mall, while Mr. March and Mr. Beverly remained in the backseat. Mr. Beverly believed the Defendant said Mr. March had shot the Defendant.

The Defendant and Mr. March discussed obtaining the money from Mr. Beverly's brother and "getting rid" of Mr. Beverly. The car then went off the road. Mr. Beverly and Mr. March again struggled over the firearms. Mr. Beverly got the black and brown gun away from Mr. March and shot him three times with it. Mr. Beverly then got out of the car. He did not see the Defendant and did not know where the Defendant went.

The police responded to the scene, and Mr. Beverly was transported by ambulance to the hospital where he remained for seven to nine days. He had scars on his stomach, leg, and buttocks, and one of the shots hit a nerve, causing his foot to "hang." He said he did not tell the police officers at the hospital that he was meeting the Defendant to sell him marijuana because he did not want to get into trouble. He acknowledged that he was convicted of two drug offenses in 2005 and drug and firearms offenses in 2011. On cross-examination, Mr. Beverly testified that in April 2006, he pled guilty to possession of ecstasy with the intent to sell and possession of cocaine with the intent to sell and received concurrent sentences of eight years of probation. In June 2011, he was convicted of possession of marijuana with the intent to sell and possession of a firearm by a convicted felon and received two-year sentences for each conviction. He was on probation at the time of the offenses and at the time of trial.

Mr. Beverly acknowledged that he had planned to sell the marijuana located in his glove compartment to the Defendant and that he was meeting with Justin to sell him marijuana. Mr. Beverly stated that while he spoke to police officers on three occasions, the first time that he mentioned he had arranged to sell marijuana to the Defendant and Justin was during a court proceeding in November 2015. Mr. Beverly agreed that when he spoke to officers, he denied that the marijuana found in his car belonged to him and made it appear as if his encounter with Justin was coincidental. He acknowledged that when he spoke to officers at the hospital, he likely denied that he knew how to contact Justin and that he did not tell the officers that Justin's number was stored in his cell phone. Mr. Beverly agreed that he had approximately $2,000 in cash in his car.

Mr. Beverly testified that the vehicle the Defendant was driving when they met appeared to be a Toyota that was champagne in color. Mr. Beverly could not recall whether Mr. March told him that he had shot two or three people that day. Mr. March also told him to watch the news while holding up the black and brown gun. Mr. Beverly agreed that Mr. March said the gun had "two bodies on it."

Mr. Michael Wilson, Mr. Beverly's brother, testified that on the evening of August 9, 2012, he received a call from Mr. Beverly, who said he needed money. Mr. Wilson heard background noise and could not understand Mr. Beverly, so Mr. Wilson ended the call. Mr. Beverly called a second time, and Mr. Wilson could hear commotion in the background. Mr. Beverly told Mr. Wilson that "they" needed $30,000 or "they are going

to do something to me." Mr. Wilson heard "scuffling" in the car, and the call ended. Mr. Wilson then received a call from a private number. When Mr. Wilson answered the call, a man told him that they had Mr. Beverly and that they were going to kill Mr. Beverly if Mr. Wilson did not give them $30,000. Mr. Wilson was instructed to meet them at a bowling alley. Mr. Wilson called his mother, Mr. Beverly's friends, and Mr. Beverly's girlfriend, but no one had heard from Mr. Beverly. Mr. Wilson went to the bowling alley but did not bring any money with him. He remained in the parking lot for ten to fifteen minutes until he received a call that Mr. Beverly was at Vanderbilt Hospital.

On the evening of August 9, 2012, Mr. Richard Colley, a manager at Pep Boys located on North Gallatin Pike, was standing behind the bay talking to a technician when he heard a "popping noise" from the road. Mr. Colley did not see anything and continued talking to the technician. He then saw a silver car traveling northbound on Gallatin Pike suddenly make a left, drive across four lanes of traffic, and strike a ditch. The driver attempted to drive the car up the embankment, but its tires began spinning. The rear passenger side door opened, and Mr. Colley heard gunfire. He saw smoke coming out of the car and guns being fired inside the car. The door then slammed shut.

Mr. Colley saw a man with blood on him exit through the front passenger side door and run up the embankment. The man ran down a road that led to a Home Depot and then veered right toward a mall. Mr. Colley lost sight of the man in the strip malls and the traffic and did not see him again. Mr. Colley saw a man sit up in the car in the backseat and yell for help. Mr. Colley and his colleagues called 9-1-1, and the man remained at the scene until emergency personnel arrived.

Sergeant Ted Woosley was the first officer at the scene at North Gallatin Pike, arriving at 7:06 p.m. He saw a silver vehicle in a ditch and an African American man, later identified as Mr. Beverly, standing outside the vehicle with his hands on top of the vehicle. As Sergeant Woosley approached, he saw a gun lying on the ground and kicked it toward the back of the vehicle and away from Mr. Beverly. Sergeant Woosley looked inside the vehicle and saw someone lying on the back passenger seat, apparently deceased.

Mr. Beverly's clothing was covered in blood. He appeared to be in pain and reported that he had been shot. He told Sergeant Woosley that an African American man with the nickname of "T" ran up the embankment and toward Home Depot. Mr. Beverly reported that the man had jumped into Mr. Beverly's vehicle and kidnapped him. Mr. Beverly said the man told him "to watch the news because he's on a killing spree" and that "this is what happens when you snitch."

On cross-examination, Sergeant Woosley testified that Mr. Beverly did not identify the man who ran from the car as the Defendant and did not tell him that the Defendant's nickname was "Marley." Mr. Beverly did not state that he had the man's cell phone number stored in his cell phone.

Officer Brad Bracey and his K-9 located the Defendant in a dumpster behind a nearby strip mall. The Defendant had a gunshot wound in his shoulder. A large amount of blood was in the dumpster, and the Defendant was not moving and was barely conscious. He was transported to the hospital by ambulance.

Crime scene investigators Felicia Evans and Lynn Mace processed the scene. A Rock Island Armory .45 automatic pistol was located in the grass behind Mr. Beverly's car. A live .45 cartridge and a spent .45 cartridge case were on the ground between the driver's side front and rear doors. A cell phone charger, a gray t-shirt, and a pair of multicolored shorts were also outside the car.

Blood was present throughout the interior of the car, and transfer blood stains were on the exterior doors and door handles. Protein powder had spilled all over the car's back compartment. At the scene, a projectile was recovered from the driver's side door of the car; a .45 caliber cartridge casing was on the floorboard on the front passenger side; and two .45 caliber cartridge casings were on the backseat.

The investigators obtained a search warrant for the car, and the car was towed to the crime scene office where Investigator Evans processed the car the following day. She located an Apple iPhone and a Motorola Boost cell phone in the front passenger compartment and a blue cell phone in the middle of the backseat. She collected a folding knife, a wallet that contained Mr. Beverly's identification and $88 in cash, a piece of paper with "T-gun" and a telephone number written on it, a set of keys, and $200 in cash from the dashboard compartment. A .45 caliber cartridge casing was on the front passenger seat; a set of keys to the Chevrolet Malibu was on the floorboard, and a jar containing baggies of what appeared to be marijuana was inside the glove box. Investigator Evans found a .40 caliber Smith & Wesson cartridge casing and a .45 caliber cartridge casing on the floorboard on the rear passenger side, and a projectile on the seat. She also located a projectile inside the car's trunk and identified strike marks throughout the car.

Investigator Evans recovered a black and silver Smith & Wesson .40 caliber pistol underneath a cooler in the rear driver's side of the car. The serial number of the pistol had been ground or scratched out. The pistol's magazine contained two live Smith & Wesson .40 caliber cartridges. A cartridge casing was "stove piped" or stuck in the ejection port where the casing failed to extract and eject properly. Investigator Evans

explained that when this occurs, a firearm will not continue to cycle and cannot be fired until the cartridge casing is manually cleared from the ejection port.

Investigator Evans lifted latent prints from the magazine of the .40 caliber pistol and the doors of the car. The Defendant's print was found beside the rear passenger side door. The prints of Mr. Beverly and Mr. March were found in other areas of the car. No prints of value were on the magazine of the pistol.

Investigator Mace collected a Cricket cell phone and two shirts outside the dumpster. The shirts were saturated in blood and appeared to have been cut off of someone by medical personnel. She collected a Motorola AT&T cell phone and a pair of shoes from inside the dumpster.

Crime scene investigator Nate Ward swabbed the Defendant's hands for gunshot residue at the hospital. He also obtained the Defendant's clothing and effects, which included an HTC cell phone, two rubber gloves, a $50 bill that was in the Defendant's pocket, and a baggie of green plant material that appeared to be marijuana. Upon collecting the HTC cell phone, Investigator Ward determined that there was no battery life left on the cell phone. He stated that pursuant to standard procedure, he removed the battery from the cell phone before submitting it to the property room in order to prevent someone from erasing the contents of the cell phone remotely. He also assisted in processing the Chevrolet Malibu and found three projectiles in the car.

On cross-examination, Investigator Ward testified that he located three separate piles of cash in the car totaling $1,675. He was unaware of the additional $200 that was recovered in one of the side pockets of the car. He also found in the car Mr. Beverly's pay stub, which showed a net pay of $34.33 and a year-to-date total of $5,326.

Detective Robert Hanson recovered footage from a security camera at CVS Pharmacy located on the northwest corner of Clarksville Pike and Kings Lane. The footage showed a silver Chevrolet Malibu driving through the parking lot, and Detective Hanson stated that it appeared to be Mr. Beverly's vehicle. On cross-examination, Detective Hanson testified that the video did not show the car's license plate or the driver. The car was being driven relatively slowly and not erratically.

Detective Hanson interviewed Mr. Beverly on multiple occasions and stated that Mr. Beverly never said he was meeting the Defendant and Justin to sell them marijuana. Rather, Mr. Beverly made it appear that his meeting with Justin was a chance encounter. Detective Hanson acknowledged that while Mr. Beverly stated that Mr. March claimed that his gun had "two bodies on it," Detective Hanson never determined whether any other homicides in addition to Mr. Ike's homicide occurred on August 9. Detective

Hanson acknowledged that Mr. Beverly's statements varied regarding whether Mr. March claimed the gun had been used in one, two, or three murders. On redirect examination, Detective Hanson testified that during his second interview, Mr. Beverly stated that "they" said, "[S]**t we already killed an N. today just like that."

Dr. Adele Lewis, a forensic pathologist, was admitted by the trial court as an expert in forensic pathology. She conducted Mr. March's autopsy. She concluded that Mr. March's cause of death was multiple gunshot wounds and that his manner of death was homicide, which she explained simply meant that his death was caused by another.

Dr. Lewis testified that Mr. March was shot five times. One gunshot from an indeterminate range entered the right side of Mr. March's upper chest, injuring his right ribs and right lung. Dr. Lewis recovered a bullet with no jacket from the soft tissues under the right side of the chest. Two gunshots from indeterminate ranges entered the left side of the upper chest, injuring the skin, soft tissue, liver, stomach, and pancreas. Dr. Lewis recovered fragments of a jacket from the right lobe of the liver, fragments of a jacket and a bullet from the soft tissues along the right side of Mr. March's body, and a jacket from the left lobe of the liver. A fourth gunshot entered the right upper arm, injuring the skin, soft tissues, and muscles in the upper arm. Dr. Lewis observed stippling and determined that gunshot was from an intermediate range, which meant that the gun's muzzle was between six inches and two or three feet away from Mr. March when fired. A fifth gunshot fired from an intermediate range entered the left side of the lower back, injuring the skin, soft tissues, ribs, small intestines, aorta, and one of the bones in the spine. Dr. Lewis recovered a bullet from the spine.

An upper portion of Mr. March's left ear had been removed. He had multiple abrasions on the back of his head, which Dr. Lewis stated were caused by blunt trauma. Mr. March also had abrasions on his left shoulder. Two arrays of contusions or bruises on his left upper chest and left upper arm were indicative of bite marks.

Federal Bureau of Investigation Agent Steve Scott, who was formally a special agent forensic scientist in the TBI's firearm identification section, was accepted as an expert in the field of firearms and tool mark analysis. While with the TBI, Agent Scott was asked to examine the Smith & Wesson .40 caliber semi-automatic pistol and the Rock Island Arms .45 caliber semi-automatic pistol that were recovered at the scene of the wreck. Photographs of the guns showed that the .40 caliber pistol was silver and black and that the .45 caliber pistol was black and brown.

Agent Scott noted that while the serial number of the .40 caliber pistol had been scratched off, he was able to clean up the pistol and obtain the serial number. He stated that the .40 caliber pistol was functioning properly but noted that the package in which he

received the pistol included a label noting that a .40 caliber cartridge casing had been "stove piped" in the pistol. He explained that stove piping occurs when the cartridge casing becomes stuck while ejecting from a firearm. When this occurs, the firearm is inoperable until the cartridge casing is manually removed. He examined the .40 caliber casing that was noted to have been stove piped into the pistol and concluded that it had been fired from the .40 caliber pistol. He stated that a magazine for a .40 caliber pistol typically holds fourteen cartridges plus one cartridge in the pistol's chamber. He said that the .45 caliber pistol was in operating condition and that a magazine typically holds seven cartridges plus one cartridge in the pistol's chamber.

Agent Scott was shown two photographs from the Defendant's cell phone, one of which was the Defendant pointing a gun at the camera and the second of which was of a black and silver firearm. Agent Scott stated that the firearm in the photograph appeared to be a Smith & Wesson brand firearm and was either a .40 caliber or .45 caliber semi-automatic pistol. He said that while other manufacturers made similar firearms, Smith & Wesson was the first manufacturer that came to mind. He stated that the firearm depicted in the photographs was consistent with the Smith & Wesson .40 caliber pistol that he had examined.

Agent Scott examined four spent .45 caliber cartridge casings, an unfired .45 caliber cartridge, and a .45 caliber projectile from the Gallatin Pike scene. He determined that the four spent cartridge casings and the projectile were fired from the Rock Island Arms .45 caliber semi-automatic pistol. He determined that two other .45 caliber cartridge casings found at the Gallatin Pike scene had been fired from the same .45 caliber pistol. He examined two lead bullet cores recovered from the Chevrolet Malibu and concluded that the cores were too big to be from a .40 caliber bullet and were consistent with a .45 caliber bullet. He was unable to match the bullet cores to the .45 caliber pistol. He also examined various bullets and bullet jackets that were recovered from Mr. March's body during his autopsy and concluded that they had all been fired from the .45 caliber pistol. The three projectiles that were collected by Investigator Ward from the Chevrolet Malibu were not submitted to the TBI for testing.

Agent Scott examined three bullets related to the murder of Mr. Ike. He determined that a bullet collected from the roadway where Mr. Ike's Impala was recovered and a bullet collected from Mr. Ike's neck were .40 caliber bullets that were fired from the Smith & Wesson .40 caliber pistol that was recovered from Mr. Beverly's vehicle after the wreck. Agent Scott was not able to associate the bullet from Mr. Ike's right hip to any of the firearms that he examined. He said the bullet had calcification and blacking that was consistent with remaining in a body for a number of months or years.

Dr. Laura Boos with the forensic biology section of the TBI crime laboratory was accepted by the trial court as an expert in serology and DNA analysis. She analyzed swabs of the firearms and the magazines for blood and DNA. Presumptive tests indicated the presence of blood on the grip of the .40 caliber pistol; the barrel, drip, and trigger areas of the .45 caliber pistol; and the tops and bottoms of the magazines. Mr. Beverly's DNA was on one area of the grip of the .40 caliber pistol. A DNA profile with a mixture of at least three individuals was on another area of the grip, and the major contributor was consistent with a mixture of the DNA of Mr. March and Mr. Beverly. A partial profile matching Mr. Beverly's DNA was on the magazine for the .40 caliber pistol. A swab of the barrel of the .45 caliber pistol had a partial DNA profile that was consistent with a mixture of at least three individuals, and Mr. Beverly was the major contributor. A partial profile matching the Defendant's DNA was on the grip and trigger of the .45 caliber pistol and the pistol's magazine.

Ms. Laura Hodge was accepted by the trial court as an expert in the field of microanalysis. She received the gunshot residue kit for Mr. March. She concluded that gunshot residue was present, which indicated that Mr. March had handled, fired, or been near a gun when it was fired. She did not receive gunshot residue kits for either the Defendant or Mr. Beverly.

Mrs. Brenda McGinnis testified that during the evening hours of April 2, 2011, she and her husband returned to their apartment to find the door kicked in. Mrs. McGinnis's Smith & Wesson .40 caliber pistol that she kept under her pillow was taken. She stated that she did not give anyone permission to take her gun and that she called the police.

On cross-examination, Mrs. McGinnis testified that when she called the police, she told the officers that her nephew, Mr. Kendel Bacon, had taken the gun. On redirect examination, she testified that on the day prior to the break in, Mr. Bacon was at her home and called someone to pick him up. Her home telephone rang, and the Defendant's number appeared on her caller ID. She gave the telephone to Mr. Bacon, who stated over the telephone that he was downstairs. Mrs. McGinnis initially testified that she did not see the person who picked up Mr. Bacon that day but later testified on recross-examination that she saw the Defendant pick up Mr. Bacon.

Officer Joshua Hargrave responded to the scene of the burglary. The door to the apartment appeared to have been forced open, and the dead bolt and the doorknob were damaged. He spoke to Mrs. McGinnis, who reported that her Smith & Wesson .40 caliber firearm was taken, along with fourteen rounds and a magazine. Officer Dennis Shepard entered the firearm's serial number into a database maintained for stolen firearms. On cross-examination, Officer Hargrave testified that the Defendant's name never came up during the course of the investigation into the burglary.

The parties stipulated that the Defendant was incarcerated in Davidson County between May 28, 2010, and May 20, 2011.

Detective Adam Weeks testified that he met with the Defendant during the early months of 2012 while the Defendant was incarcerated on a probation violation. The Defendant provided him with information regarding a homicide that Detective Weeks was investigating and additional information that Detective Weeks passed along to Sergeant Paul Smith. The Defendant wrote out a statement, which was entered into evidence. In the statement, the Defendant identified Michael Mills and "Hardhead" as the people who committed the homicide that Detective Weeks was investigating. The Defendant also stated that "Hardhead" and Donell Hancock, who was known as "Ruger," committed a robbery that Detective Weeks was investigating. Detective Weeks recognized "Hardhead" and "Ruger" as gang members and believed the Defendant's information would be of interest to Sergeant Smith. The Defendant identified Michael Mills, Donell Hancock, and Mr. March as those who had committed a shooting. The Defendant included in the statement, "please let me get back to work and my family. And I will go to the precinct and give this statement to any officer available right now with details. I can leave with an officer now at the precinct." On May 17, 2012, Detective Weeks and Sergeant Smith met with the Defendant while the Defendant was incarcerated without bond. Following the meeting, the officers agreed to arrange for the Defendant's release pending a resolution of his probation violation warrant so that the Defendant could assist the officers.

Sergeant Paul Smith testified regarding his meeting with Detective Weeks and the Defendant. Sergeant Smith stated that the information that he hoped to obtain from the Defendant was important to him and his colleagues. Following the Defendant's release from incarceration, Sergeant Smith met with him, and they reviewed the special operative agreement that set forth the rules for confidential informants, which the Defendant signed on June 10, 2012. Sergeant Smith testified regarding the rules to which the Defendant was required to abide as a confidential informant. As a condition of his release, the Defendant was required to wear a GPS monitoring device.

The Defendant agreed to provide information regarding the individuals listed in his statement, including Mr. March, who was also identified as "Ke-Thang." At some point, the Defendant told Sergeant Smith that he could provide the location of Mr. March's home. The Defendant did not provide an address but provided a description of an apartment building near a breezeway. Surveillance of that location did not produce any information. The Defendant also sent Sergeant Smith a photograph of Mr. March holding an assault rifle but did not provide any further information regarding Mr. March.

Sergeant Smith did not recall the Defendant providing him with Mr. March's telephone number or stating that he had been regularly communicating with Mr. March.

Sergeant Smith provided the Defendant with a recorder to record telephone conversations. The Defendant never provided Sergeant Smith with any recordings of calls, and Sergeant Smith never received any indication that the Defendant had made any recordings. The Defendant did not return the recorder. Sergeant Smith later learned that the Defendant removed his GPS device. Prior to August 9, 2012, the Defendant did not notify Sergeant Smith that he was going to be in the company of Mr. March.

Ms. Nichole Murphy with the Davidson County Criminal Court Clerk's Office testified that the Defendant had two cases pending in 2012. On May 28, 2012, the Defendant's bond was reinstated; he was required to have an electronic monitoring ankle bracelet; and his case was continued until July 6. Following multiple court appearances, the Defendant's case was continued to August 9. On August 9, the Defendant did not appear in court, and a warrant was issued for his arrest.

Mr. Emmanuel Omatu, the Defendant's probation officer, testified that as a condition of the Defendant's release, he was required to have an electronic monitoring ankle bracelet and a curfew from 9:00 p.m. to 6:00 a.m. On August 6, 2012, Mr. Omatu received an alert that the ankle bracelet had been tampered with. He and other staff members attempted to locate the ankle bracelet and the Defendant but were unsuccessful. Mr. Omatu prepared a probation violation warrant, which was signed by a judge.

Detective Chad Gist with the surveillance and investigative support division of the Metropolitan Nashville Police Department was accepted by the trial court as an expert in the field of digital forensic science. He testified regarding the extraction of information from multiple cell phones by officers in his division. Officers extracted information from Mr. Ike's iPhone, Mr. Hall's ZTE phone, the Defendant's HTC phone, and a SIM card from Mr. Beverly's Motorola phone. The information extracted from the Defendant's cell phone included his contacts list, photographs, and text messages. The information extracted from the SIM card from Mr. Beverly's cell phone only included his contacts list and call logs.

Detective Chad Holman testified that on the morning of August 14, 2012, he received a missing person's report that had been filed on behalf of Mr. Ike. Detective Holman stated that upon reviewing the report, it became evident that Mr. Ike's case could be related to the incident involving Mr. Beverly that occurred on August 9. Detective Holman was aware that Mr. Ike's vehicle had been located and towed away from the area. He gathered officers to search the area of 33rd Avenue and Felicia Street. While he and his partner were interviewing Mr. Hall, they learned that Mr. Ike's body had been

located. Mr. Hall agreed to provide Detective Holman with Mr. Hall's cell phone. Detective Holman stated that he failed to submit the latent prints and the DNA swabs from Mr. Ike's vehicle for testing due to "oversight."

After speaking to Detective Hansen, Detective Holman searched in the Sunnyview area for a vehicle that had been used in Mr. Ike's homicide, but Detective Holman was unable to locate the vehicle. Detective Holman obtained a judicial subpoena for a library key chain card that was attached to a set of Mazda keys found in the Defendant's possession. The library card was registered to Ms. Essence Wade. Detective Holman met Ms. Wade in a parking lot of a Burger King where he photographed a Mazda van.

Detective Holman obtained court orders allowing him to retrieve the cell tower records relating to the cell phones of the Defendant, Mr. Hall, and Mr. Ike. Cricket did not comply with the court order to provide the records relating to Mr. Hall's cell phone. Detective Holman testified extensively regarding the information extracted from the Defendant's cell phone. The Defendant identified himself as "Marley" in various photographs and text messages sent in the days leading to the offenses. Email addresses associated with the cell phone were listed as 2-marleyworld60@gmail.com and Keandre.march@yahoo.com. Contacts listed in the Defendant's cell phone included "Ke-Thang," who was later identified as Mr. March, "Slug," who was later identified as Mr. Beverly, "Ruger," who was later identified as Donell Hancock, and "Goldie," who was later identified as Mr. Ike. Mr. Ike's number in the Defendant's contact list had "*67" in front of it, which Detective Holman stated allows a call to be placed without the caller's number appearing on the recipient's caller ID.

The Defendant sent a photograph of himself making a hand signal and wearing a baseball cap with a stack of cash underneath the cap to various numbers on July 29, August 8, and August 9. He sent a photograph of himself holding a large amount of cash to various numbers on July 29 and August 8. He sent a photograph of himself making a hand signal to various numbers on August 7 and August 8. Many of the photographs included the caption "Marley." On August 8 at 6:24 a.m., he sent a photograph of himself wearing a baseball cap backwards with the caption "Marley." On August 9 at 4:07 a.m., the Defendant received a photograph of himself and a woman.

Detective Holman also testified regarding text messages that were included in the extraction report of the Defendant's cell phone. Detective Holman noted that there was a gap in time during which no text messages were sent or received between July 8 and July 23, 2012. On July 27, 2012, the Defendant had the following text message exchange with someone whose number ended in -1085:

| Time | Sender | Message |
|---|---|---|
| 7:09:28 p.m. | Defendant | Cuz |
| 7:09:43 p.m. | -1085 | Wat up |
| 7:10:23 p.m. | Defendant | Can u c em |
| 7:10:46 p.m. | -1085 | Sittin by him |
| 7:11:52 p.m. | Defendant | Let me know soonz he get ready to come out I'm out here |
| 7:13:15 p.m. | -1085 | Ok.  Ima cum out at 7 40 ima call u |
| 7:14:08 p.m. | Defendant | Dats Wats up text me soonz he get up tho |
| 7:14:23 p.m. | -1085 | Yea |
| 7:20:07 p.m. | Defendant | Fina run some where dont let em leave |
| 7:21:13 p.m. | -1085 | Ok im bout to leave in a min so dnt be 2 lng |
| 7:21:56 p.m. | Defendant | Aite |
| 7:46:42 p.m. | Defendant | Can u get em to walk out wit chu I'm out here |
| 7:47:25 p.m. | -1085 | Im at the house had to let Mario in |
| 7:48:00 p.m. | Defendant | Aite |

On July 29, the Defendant had the following text message exchange with a number ending with -8535:

| Time | Sender | Message |
|---|---|---|
| 3:09:35 p.m. | -8535 | Were u live |
| 3:10:27 p.m. | Defendant | Nashville |
| 3:29:39 p.m. | -8535 | u guna come get me |
| 3:30:57 p.m. | Defendant | i can't leave da city I'm on house arrest |
| 3:31:15 p.m. | Defendant | I gota c n at 9 out on bond |

Detective Holman noted that at the time, the Defendant lived in Nashville, was out of jail on bond, and had an electronic monitor.  On July 30, the Defendant sent text messages to a number before realizing that he had the wrong number.  The number to which the Defendant was sending text messages was one digit different from Mr. Ike's cell phone number.

On July 31, the Defendant had the following text message exchange with a number ending in -3297:

| Time | Sender | Message |
|---|---|---|
| 9:06:00 p.m. | Defendant | Wat up fool I'm on minz on that phone n this one still dead |
| 9:09:58 p.m. | -3297 | Goldie just rode thrw hea fool Loyal is a must |
| 9:10:57 p.m. | Defendant | Did he stop or just ride through |
| 9:12:59 | -3297 | Just riding u knw Cuz be n Da alley behind boys n girl club Loyal is a must |
| 9:18:40 p.m. | Defendant | Aite I'm n tonight tho but ima cut dis s**t off my legg n get da thuggn soon keep me posted on that n***a Wen u c em cuz I got ya |
| 9:21:26 p.m. | -3297 | Ok a cuz wid me now im out hea now too cuz real s**t n them n****s across Da street Loyal is a must |
| 9:30:41 p.m. | Defendant | I got u watch |

On August 3 at 9:06:28 p.m., the Defendant sent a text message to the number ending in -3297 asking, "U aint seen Goldie."  The Defendant received a text message replying, "naw."

On August 5, the Defendant had the following text message exchange with Mr. March:

| Time | Sender | Message |
|---|---|---|
| 1:53:39 p.m. | Mr. March | Wea u at cuz |
| 1:55:29 p.m. | Defendant | My house waiting on one of these n***** to hit me up slug said he ain't came out yet n jojo said Goldie b**** azz ain't Ansa |
| 1:55:53 p.m. | Mr. March | Aite |
| 1:56:44 p.m. | Defendant | Ima hit u up soonz I get word on something |

On August 6, the Defendant had the following text message exchange with Mr. March:

| Time | Sender | Message |
|---|---|---|
| 9:23:54 a.m. | Defendant | Dis my new numbka |
| 9:24:37 a.m. | Mr. March | Wen u coming to get me |
| 9:25:31 a.m. | Defendant | Soonz I get out these clothes |
| 9:25:43 a.m. | Mr. March | Aite |

The Defendant had multiple text message exchanges with others in which he identified himself as "Marley."  Beginning on August 6, the Defendant had multiple text message

- 19 -

exchanges with a number ending in -1711 that continued throughout the next few days during which the Defendant referred to the person as "baby." Later in the evening, the Defendant had the following text message exchange:

| Time | Sender | Message |
| --- | --- | --- |
| 6:31:12 p.m. | Mr. March | Have u tryed to call me cuz my phone was dead |
| 6:32:03 p.m. | Defendant | Naw not yet she on her way now tho |
| 6:32:12 p.m. | Mr. March | Aite |
| …. | | |
| 7:32:57 p.m. | Defendant to -3297 | U ain't seen dat n**** again today |
| 7:35:25 p.m. | Mr. March | Wea u at cuz |
| 7:36:42 p.m. | -3297 | Nt wen I left |

During the morning of August 7, when the Defendant received a text message from -1711 asking what he was doing, the Defendant replied, "Tryna c is dis n**** home." At 10:50 a.m., the Defendant sent a text message to Mr. March asking, "U get it." Mr. March replied with Mr. Hall's cell phone number. The Defendant immediately sent a text message to Mr. Hall stating, "Wats up lil cuz dis Marley." Later in the afternoon, the Defendant sent Mr. Ike's cell phone number to Mr. Hall.

At 5:14 p.m., Mr. March sent the Defendant a text message stating, "I'm waiting on gal." Around that same time, the Defendant exchanged a series of text messages with "O'Ball," including a text message in which the Defendant stated, "Cuz might still c out but i really ain't tryna let key thang n on dis one just uz." The Defendant continued to exchange text messages with a cell phone number ending in -1711 throughout the evening and night. At 8:29 p.m., Mr. March sent the Defendant a text message stating, "Come get me cuz I cant stand to be in this house." Beginning at 10:05 p.m., the Defendant and Mr. March exchanged a series of text messages during which Mr. March stated, "im waitin u." At 10:23 p.m., the Defendant sent Mr. March a text message stating, "I'm on my way." Mr. March responded, "Cuz im finna meet u in the projects."

On the morning of August 8, the Defendant exchanged text messages with multiple cell phone numbers during which he identified himself as "Marley." He sent a photograph of himself holding a large amount of money to one of the cell phone numbers and sent another text message stating, "Yea I'm … on da run." Later that morning, he exchanged text messages with a number ending in -4906 and referred to the person with that cell phone number as his wife. The Defendant exchanged text messages with his wife and the number ending in -1711 throughout the day. During the evening, the Defendant had the following text message exchange with his wife:

| Time | Sender | Message |
|---|---|---|
| 6:10:32 p.m. | Defendant | I'm not mad at u or anything I just can't let them catch me there |
| 6:14:53 p.m. | Wife | I kno its cool i understand.  im sure aftr u dnt sho for court 2 mar they gne b over there so dnt evn ride by cuz them bond ppl coming |
| 6:17:42 p.m. | Defendant | I kno ima have u hold some money tomorrow round 4 for me |
| 6:24:50 p.m. | Wife | Ok b carful cuz they gne b hot on ya. me n u need to lay low cuz they gne watc n me2 |

At 7:24 p.m., the Defendant sent a text message to Mr. Beverly stating, "West craccin."  The Defendant continued to exchange text messages with his wife and number -1711 throughout the evening and the following day.  During one exchange on August 9, his wife sent him a photograph of him and a woman.  Beginning at 6:05 p.m., the Defendant and his wife exchanged text messages during which they argued about another woman.  At 6:11 p.m, the Defendant sent his wife a text message stating, "I'm not wit no b***h but my 40."

After sending the text message to his wife at 6:11 p.m., the Defendant did not send or receive any text message until 6:23 p.m., when Mr. Hall sent him a text message stating, "Throw your phone."  Detective Holman testified that based on his investigation into the time frame of the offenses, it appeared that Mr. Hall sent this text message after Mr. Ike was shot.

On cross-examination, Detective Holman testified that the text messages were not extracted from the cell phones of Mr. March or Mr. Beverly.  During the extraction of Mr. Hall's cell phone, it was discovered that most of the data had been erased.  Detective Holman acknowledged that the Defendant made a number of calls between 6:16 p.m. and 6:23 p.m. on August 9.  Detective Holman stated that the Mazda that he viewed was light green and was not silver, was not a Toyota, and was not a truck or a SUV.

Detective Holman testified that on August 9 at 6:05 p.m., Mr. Beverly's cell phone communicated with a cell tower located off Charlotte Avenue in West Nashville near the scene of Mr. Ike's shooting.  Mr. Beverly had not informed officers that he was in West Nashville when questioned regarding his whereabouts before meeting the Defendant at Sunnyview Court.  When Detective Holman asked Mr. Beverly about being in West Nashville, Mr. Beverly's demeanor changed; he became defensive; and he kept stating that he was not involved in Mr. Ike's death.

Detective Joseph Chad High with the surveillance and investigative support unit of the Metropolitan Nashville Police Department was accepted by the trial court as an expert in the field of call detail and record analysis. He testified that a cell phone is essentially a two-way radio that receives and transmits radio signals through a cell tower. He explained that the cellular network is constantly scanning for a handset so that any calls can be routed to the handset correctly. When making or receiving a call, the handset utilizes the cell tower with the best quality signal, which typically is the cell tower closest to the handset although this is not always the case. He noted that the usage of a cell tower at a particular time of day and any structures between the handset and cell tower that prevent a direct line of sight may affect the quality of the signal so that the handset may use a cell tower located further away. Detective High acknowledged that while he could not definitively state that a handset communicated with the closest tower, he plotted a series of various calls to establish a course of direction. He stated that information from call detail records is used to corroborate other information obtained in an investigation. He also offered testimony regarding how cell phones and networks operate once a call is made or received.

Detective High testified that when he received call detail records, they generally included information regarding the outgoing and incoming calls, the duration of the call, and the towers with which the handset communicated during the calls. The wireless companies also send a tower list to allow Detective High to determine the location of the cell towers with which the handset communicated. He stated that the records do not indicate the location of the handset but only the sector of the cell tower with which the handset communicated. He explained that most cell towers have three sectors that encompass a 360-degree circle around the tower and that the tower list will include the beam or direction that each sector is facing. He stated that a cell tower will cover a range of three to fifteen miles in a rural area and a range of one to five miles in an urban area.

Detective High reviewed the call detail records and cell tower information related to cell phones belonging to the Defendant, Mr. Ike, and Mr. Beverly. Both the Defendant and Mr. Ike had Sprint cell phones, and Mr. Beverly had a T-Mobile and a Nextel cell phone. He mapped the data from the call detail records and the cell tower data for the time period of August 9 from 1:30 p.m. to 8:00 p.m. He noted that, generally, location data is only available for calls and not for text messages.

At 1:31 p.m., on August 9, the Defendant called Mr. March. From 2:25 p.m. to 5:37 p.m., the Defendant made and received multiple calls during which his cell phone communicated with cell towers located in the Hermitage area. The Defendant received calls from Mr. Hall at 4:08 p.m. and 4:09 p.m., and the Defendant called Mr. Hall at 5:26 p.m. Mr. Ike called Mr. Hall at 4:39:23, 4:39:53, and 4:40 p.m., and each call did not

exceed twenty-six seconds. At 5:38 p.m., Mr. Hall called Mr. Ike, and the call lasted sixty-one seconds.

At 5:45 p.m., the Defendant called Mr. Hall, and the call lasted two minutes and seven seconds. During the call, the Defendant's cell phone communicated with multiple towers, showing that he was traveling east to west near downtown Nashville. At 5:48 p.m., the Defendant called a number ending in -1711, and his cell phone communicated with towers showing that he was traveling toward 406 33rd Avenue North where Mr. Ike was shot. At 5:55 p.m., the Defendant received a call during which his cell phone communicated with a tower that was within the cell coverage area of the scene of the shooting. At 5:58 p.m., the Defendant called Mr. Hall, and the call lasted forty-four seconds. At 6:04 p.m., the Defendant received a call from Mr. Hall that lasted twenty-three seconds. Both calls communicated with the same tower in the cell coverage area of the shooting scene. At 6:12 p.m., Mr. Ike called Mr. Hall during which Mr. Ike's cell phone communicated with the same tower with which the Defendant's cell phone had been communicating. This was Mr. Ike's final outgoing call.

Four minutes later, at 6:16 p.m., the Defendant called Mr. Beverly, and the call lasted twenty-seven seconds. The Defendant's cell phone communicated with a cell tower showing that he was leaving the coverage area where the shooting occurred, and Mr. Beverly's cell phone communicated with a Nextel tower near the Defendant's location. The Defendant called Mr. Beverly again at 6:17 p.m., and the call lasted thirty-four seconds. At 6:21 p.m., the Defendant called Mr. Hall while communicating with a cell tower in north Nashville. At 6:23:51 p.m., the Defendant received a text message from Mr. Hall stating, "Throw your phone," and at 6:24:08 p.m., the Defendant called Mr. Hall.

At 6:30 p.m., the Defendant called Mr. Beverly, and the call lasted forty seconds. During the call, both of their cell phones communicated with towers near Sunnyview Court. At 6:31 and 6:34 p.m., the Defendant made and received calls during which his cell phone communicated with a cell tower whose coverage encompassed Sunnyview Court. At 6:49:06, 6:49:29, and 6:49:49 p.m., Mr. Beverly called Mr. Wilson during which Mr. Beverly's cell phone communicated with towers near Sunnyview Court. Mr. Beverly received calls from Mr. Wilson at 6:49:56 p.m. lasting fifty-three seconds, at 6:51 p.m. lasting twenty-six seconds, and 6:53 p.m. lasting three minutes and twenty-six seconds. During each of these calls, Mr. Beverly's cell phone communicated with towers located near Sunnyview Court. At 7:32 p.m., Mr. Beverly received a call that lasted seven seconds during which his cell phone communicated with a tower in the Gallatin Pike area near Hendersonville.

On cross-examination, Detective High agreed that the location of a handset can only be determined in terms of the range of the service of the cell tower and that he could not determine a cell tower's range based upon the call detail records. He also agreed that cell phones do not always communicate with the closest cell tower but communicate with the most efficient cell tower. Factors that determine the most efficient cell tower include the line of sight, the terrain, the time of day and year, call volume, and the location of any large bodies of water. Detective High did not have access to the algorithms that determine the most efficient tower, and he agreed that it was impossible to determine how often a cell phone communicates with the closest tower as opposed to a tower located a further distance away.

At the close of the proof, the jury convicted the Defendant of first degree premeditated murder, unlawful possession of a handgun, three counts of especially aggravated kidnapping, attempted first degree murder, especially aggravated robbery, employment of a firearm during the commission of a dangerous felony, theft of property valued less than $500, and failure to appear. As agreed by the parties, the trial court examined the Defendant's criminal history and determined that he had prior felony convictions necessary to support the firearm convictions.

Following a sentencing hearing, the trial court imposed sentences of life imprisonment for first degree murder, two years for unlawful possession of a handgun by a convicted felon, twenty-one years each for especially aggravated kidnapping resulting in serious bodily injury and especially aggravated kidnapping for ransom, nineteen years for especially aggravated kidnapping accomplished with a deadly weapon, twenty years for attempted first degree murder, ten years each for aggravated robbery and employment of a firearm during the commission of a dangerous felony while having prior felony convictions, eleven months and twenty nine days for theft, and two years for failure to appear. The trial court ordered that the Defendant's twenty-one-year sentence for especially aggravated kidnapping resulting in serious bodily injury and his ten-year sentence for employment of a firearm during the commission of a dangerous felony run consecutively to each other and to his life sentence for first degree murder. The trial court ordered that the remaining sentences run concurrently, for an effective sentence of life imprisonment plus thirty-one years. The judgments were later amended to reflect that the especially aggravated kidnapping convictions were merged. The Defendant filed a motion for new trial, which the trial court denied. This appeal followed.

**ANALYSIS**

On appeal, the Defendant challenges (1) the sufficiency of the evidence of his convictions for first degree premeditated murder and theft, (2) the trial court's denial of his motion to sever the offenses for trial, (3) the admission of bad act evidence pursuant

- 24 -

to Tennessee Rule of Evidence 404(b), (4) the admission of evidence that the murder victim was a police informant, (5) the trial court's denial of his motion to suppress his cell phone records obtained pursuant to a judicial subpoena, (6) the trial court's denial of his motion to exclude cell tower evidence as unreliable expert proof, (7) the trial court's denial of his motion to suppress evidence obtained from the search of his cell phone, (8) the admission of text messages from the Defendant's cell phone, (9) the admission of photographs from the Defendant's cell phone, and (10) the trial court's imposition of partial consecutive sentences.

## I.  Sufficiency

The Defendant contends that the evidence is insufficient to support his convictions for first degree premediated murder and theft.  When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Therefore, this court will not re-weigh or reevaluate the evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt.  *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).  The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction.  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence.  *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).  "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

### A.  First Degree Premeditated Murder

The Defendant contends that the evidence is insufficient to establish his identity as the perpetrator, to support a theory of criminal responsibility, and to establish premeditation.  The State responds that the evidence is sufficient to support the

Defendant's conviction of first degree premeditated murder of Mr. Ike. We agree with the State.

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id*.

### 1. Identity and Criminal Responsibility

Identity is an essential element of any crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). Identity may be established with circumstantial evidence alone. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). "[T]he evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt." *Bell*, 512 S.W.3d at 198 (citing *Dorantes*, 331 S.W.3d at 380-81). The jury determines the weight to be given, and inferences to be drawn from, circumstantial evidence. *State v. Gibson*, 506 S.W.3d 450, 458 (Tenn. 2016) (citing *Dorantes*, 331 S.W.3d 379). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

At trial, the State relied, in part, upon a theory of criminal responsibility for the conduct of another, and the trial court instructed the jury on criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2).

Although not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that

- 26 -

the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); *see State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

The evidence presented at trial established that the Defendant had been searching for Mr. Ike in the days leading up to Mr. Ike's death. The Defendant utilized others to help him in determining Mr. Ike's whereabouts. During that same time period, the Defendant sent a text message in which he expressed his plans to remove his electronic monitoring device and "get da thuggn soon." He removed his GPS monitoring device and did not return to his home in an effort to avoid detection. Two days before the shooting, Mr. March sent Mr. Hall's cell phone number to the Defendant via text message, and the Defendant later sent Mr. Ike's cell phone number to Mr. Hall, who was with Mr. Ike at the time of the shooting. Cell phone records showed multiple calls between Mr. Hall and the Defendant just prior to and shortly after the shooting, and the cell phones of the Defendant and Mr. Ike were communicating with the same cell phone tower that covered the area in which the shooting occurred.

Ms. Cartwright saw Mr. Ike's car drive up to Mr. Hall's home and park on the street. Mr. Hall exited his home and entered the car on the passenger side. Ms. Cartwright saw a man running down the street and toward Mr. Ike's car while holding a gun. She heard gunshots shortly thereafter and saw a silver SUV speeding away. Approximately eleven minutes after Mr. Ike made his last outgoing call utilizing the cell tower that covered the area in which the shooting occurred, Mr. Hall sent the Defendant a text message instructing him to "Throw your phone," and the Defendant responded by calling Mr. Hall.

The murder weapon, a Smith & Wesson .40 caliber pistol that was black and silver, was found in Mr. Beverly's car after the Defendant and Mr. March abducted him shortly after the shooting. Mr. Beverly identified the Defendant as possessing the pistol when Mr. Beverly was initially abducted. Photographs of the Defendant holding a similar pistol were on his cell phone, and he sent a text message to his wife one minute before Mr. Ike made his last call to Mr. Hall stating, "wit no b***h but my 40." The jury could infer from this evidence that the Defendant was in possession of the murder weapon both before and after the shooting and, thus, participated in the shooting.

Based upon the cell phone records, the Defendant pointed the gun that was used to kill Mr. Ike at Mr. Beverly in another area of town sometime between 6:30 p.m. when he last called Mr. Beverly and 6:49 p.m. when calls began to be exchanged between Mr. Beverly's cell phone and Mr. Wilson's cell phone regarding the Defendant's demand for ransom. The Defendant also boasted to Mr. Beverly that he had committed other murders

earlier in the day. We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish the Defendant's identity as a perpetrator. Even if the Defendant was not the shooter, the evidence, when viewed in a light most favorable to the State, establishes that he solicited, directed, aided, or attempted to aid another to commit the offense with the intent to promote or assist in the commission of the offense.

## 2. Premeditation

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id*. at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors tending to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; and preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id*. Repeated blows, although not alone sufficient to establish premeditation, may be a relevant factor in determining the existence of premeditation. *Id*. Mutilation of the body may show that a killing was not rash or impulsive. *Davidson*, 121 S.W.3d at 616. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)). "Under *Bland*, shooting a retreating victim alone provides circumstantial evidence of premeditation." *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013).

The evidence presented at trial established that the Defendant had been searching for Mr. Ike, or "Goldie," in the days leading up to the shooting and had others keeping him apprised of Mr. Ike's whereabouts. Through a text message exchange regarding Mr. Ike's location and the Defendant's request that he be kept apprised of Mr. Ike's location, the Defendant announced his intentions to remove his electronic monitoring device and "get da thuggin soon." To avoid detection, the Defendant removed his electronic monitoring device a few days before the shooting, and text messages between him and his wife established that the Defendant had not been staying at his home. The Defendant planned in advance to miss his scheduled court appearance on the day of the shooting, as

- 28 -

illustrated by a text message exchange between him and his wife on the day before the shooting. The jury could have inferred from such evidence that the Defendant was planning the shooting and that his actions were aimed at facilitating the crime and avoiding detection.

Prior to the shooting, the Defendant obtained Mr. Hall's cell phone number and sent Mr. Ike's cell phone number to Mr. Hall. The Defendant and Mr. Hall exchanged calls both before and after the shooting, and the Defendant's cell phone utilized a cell tower located within the area of the shooting when the shooting occurred. The Defendant had possession of the murder weapon, a Smith & Wesson .40 caliber pistol, shortly after the shooting, as established by Mr. Beverly's testimony about the abduction and the scientific analysis of the weapon recovered from Mr. Beverly's car. Photographs extracted from the Defendant's cell phone show the Defendant in possession of a similar gun sometime before the shooting occurred. The Defendant sent a text message to his wife in the early evening prior to the shooting in which he stated that he was "wit no b***h but my 40," which the jury could infer was a reference to the Smith & Wesson .40 caliber pistol. The jury could infer from such evidence that the Defendant planned with Mr. Hall to lure Mr. Ike to the area and that the Defendant participated in the shooting.

The victim sustained multiple gunshot wounds and was unarmed when he was found. There was no evidence that items had been taken from the victim, and he was found holding money in his hand. Following the shooting, Mr. Hall sent the Defendant a text message instructing the Defendant to dispose of his cell phone. The Defendant demonstrated calmness immediately after the shooting as he then contacted Mr. Beverly prior to abducting him. During the abduction of Mr. Beverly, the Defendant boasted about committing other murders that day. We conclude that this evidence, when viewed in a light most favorable to the State, was sufficient to establish premeditation.

## B. Theft

The Defendant was convicted of theft based upon his possession of the stolen Smith & Wesson .40 caliber pistol. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. The State must prove that a defendant: (1) knowingly obtained or exercised control over property; (2) did not have the owner's effective consent; and (3) intended to deprive the owner of the property. *State v. Amanns*, 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999).

The Defendant maintains that the State failed to establish that he knowingly obtained or exercised control over the pistol. The State acknowledges that the evidence did not demonstrate that the Defendant took the pistol from Mrs. McGinnis's home.

Instead, the State argues that the Defendant exercised control over the pistol. We note that in closing arguments, the State did not argue that the Defendant took the pistol from Mrs. McGinnis's apartment but, rather, argued that the Defendant was exercising control over the pistol on the day in which the other offenses occurred. In light of the State's theory of the case, we question why the State elicited testimony from Mrs. McGinnis on redirect examination that a few days prior to the burglary, someone called her nephew, who she had told police officers committed the burglary, from the Defendant's telephone number and that, thereafter, she saw the Defendant come to her apartment complex to pick up her nephew. Immediately after Mrs. McGinnis testified, the State entered into a stipulation with the defense that the Defendant was incarcerated when the burglary occurred and had been incarcerated for almost one year at the time of the burglary. Thus, it appears that the State elicited testimony that it knew to be untrue in light of its agreed upon stipulation. Nevertheless, the Defendant did not raise the issue regarding the admission of such testimony on appeal, and as we discuss below, we conclude that the evidence is insufficient to support the theft conviction.

The evidence demonstrated that the Defendant had possession of the pistol shortly after the shooting as demonstrated by Mr. Beverly's testimony during which he described the gun that the Defendant pointed at him while abducting him. Photographs extracted from the Defendant's cell phone show the Defendant in possession of a similar gun sometime before the shooting occurred. The Defendant sent a text message to his wife in the early evening prior to the shooting in which he stated that he was "wit no b***h but my 40," which the jury could infer was a reference to the Smith & Wesson .40 caliber pistol. We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish that the Defendant knowingly exercised control over the pistol and did not have Mrs. McGinnis's effective consent to do so.

The Defendant maintains that the evidence is insufficient to establish that he knew that the pistol was stolen and that, as a result, he intended to deprive Mrs. McGinnis of the pistol. A defendant's possession of recently stolen property, unless satisfactorily explained, creates a permissible inference that the defendant had knowledge that the property had been stolen. *See State v. James*, 315 S.W.3d 440, 450-51 (Tenn. 2010). "Recently" is a relative term which does not have a fixed meaning and is dependent upon the nature of the property and the facts and circumstances of the case. *State v. Anderson*, 738 S.W.2d 200, 202 (Tenn. Crim. App. 1987). The longer the period of time since the theft, the more doubtful the inference. *Id*. The jury, as the trier of fact, must determine whether the inference is warranted. *Barnes v. United States*, 412 U.S. 837, 845, n.9 (1973). The State has the burden of establishing that the defendant knew that the property was stolen; the burden never shifts to the defendant. *Id*.

The purpose of the recency requirement is to "insure that the party found in possession of the stolen property is aware of the stolen nature of the goods in his possession." *Anderson*, 738 S.W.2d at 202. The proper test is "whether the time lapse between the theft and the accused's possession of the property is sufficiently short, given the circumstances of the case, to preclude the possibility of a transfer of the stolen property from the thief to an innocent party." *Id.* While the amount of time that elapsed between the theft and the discovery of the property is an important factor in determining whether the property was "recently" stolen, other factors include "the characteristics of the stolen property, such as salability and portability, both of which affect the ease with which the property can be transferred by a thief to an innocent party." *Id.*

The burglary during which the pistol was taken occurred approximately sixteen months before the Defendant was found in possession of the pistol. At the time of the burglary in April 2011, the Defendant had been incarcerated since May 2010, and he was not released until approximately one month after the burglary. The only evidence of any connection between Mrs. McGinnis's nephew, who was alleged to have stolen the pistol, and the Defendant was the testimony of Mrs. McGinnis, which was later established to be mistaken based upon the parties' stipulation. The State presented no evidence regarding the circumstances under which the Defendant obtained the pistol. The weapon was portable personal property which could easily be transferred from one person to another in the sixteen months which passed between its theft and the Defendant's obtaining possession of it. The only evidence that the State presented to support its claim that the Defendant was aware that the pistol was stolen was that the serial number had been scratched through. We conclude that this evidence alone is insufficient to establish that the Defendant knew that the pistol was stolen. Accordingly, the evidence is insufficient to support the Defendant's conviction for theft, and, therefore, we reverse the conviction.

## II. Severance

The Defendant maintains that the trial court erred in denying his motion to sever the offenses. He maintains that trial court's denial of his motion was improper under Tennessee Rule of Criminal Procedure 14(b)(1) because the offenses involving Mr. Ike, the offenses involving Mr. Beverly, the theft charge, and the charge of failure to appear did not constitute a common scheme or plan and that the evidence of each "criminal episode" would not have been admissible at trial involving any of the other criminal episodes.

### A. Pretrial Hearings

Prior to trial, the Defendant filed a motion seeking to sever his trial from Mr. Hall's trial and to sever the counts in the indictment. The Defendant requested that the

counts be severed into four separate trials: (1) the charge of first degree premeditated murder of Mr. Ike; (2) the two firearm charges and the charges in which Mr. Beverly was the victim; (3) the theft charge; and (4) the failure to appear charge. The Defendant relied upon Tennessee Rule of Criminal Procedure 14(b)(1) and argued that the offenses were not part of a common scheme or plan, that the majority of the evidence would not be admissible in separate trials, and that the probative value of the evidence is outweighed by the danger of unfair prejudice. The State filed a response and an amended response in which it argued that the counts were mandatorily joined pursuant to Tennessee Rule of Criminal Procedure 8(a) because the counts arose from the same criminal episode. The State maintained that even if the counts are not subject to mandatory joinder, they are subject to permissive joinder pursuant to Rule 14 because they are part of a common scheme or plan.

The State included a summary of the evidence in its response, which the parties agreed to allow the trial court to consider in addressing the Defendant's motion. According to the State's summary, on Thursday, August 9, 2012, the Defendant was scheduled to appear in criminal court on a pending felony charge and a pending probation revocation proceeding. The Defendant had been released on bond because he had agreed to cooperate with officers in an ongoing investigation into gang-related activities. He wrote a note at his proffer naming gang members about whom he could gather information. He was required to wear an electronic monitoring device as a condition of release, and he removed the device on August 7. He failed to appear in court on August 9. Text messages from the Defendant demonstrate his intent not to appear in court, to remove his electronic monitoring device, and to elude his bondsmen and the police. The text messages also demonstrate that the Defendant's removal of the device and his failure to appear in court were related to his hunt for Mr. Ike.

The Defendant was searching for Mr. Ike in late July, and text messages extracted from the Defendant's cell phone revealed that the Defendant had been asking around for "Goldie," who was Mr. Ike. A case where Mr. Ike had acted as a confidential informant was on the general session docket in July. The Defendant's cell phone records and information obtained from Mr. Hall during an interview revealed that the Defendant conspired with Mr. Hall to have Mr. Hall lure Mr. Ike to Mr. Hall's house. On August 7, the Defendant sent Mr. Ike's cell phone number via text message to Mr. Hall. Cell phone records reveal six calls between Mr. Hall and the Defendant between 4:09 p.m. and 6:04 p.m. on August 9. Text messages demonstrate that at 6:11 p.m., the Defendant was in possession of the murder weapon. At 6:21 p.m., the Defendant called Mr. Hall; at 6:23 p.m., Mr. Hall sent the Defendant a text message instructing him to "[t]hrow your phone"; and the Defendant called Mr. Hall again at 6:24 p.m.

On the evening of August 9, Mr. Ike parked his car in front of Mr. Hall's home, and Mr. Hall got in the front passenger seat of Mr. Ike's car. Mr. Hall maintained in an interview that Mr. Ike came to sell him marijuana. Mr. Hall claimed that an African-American man wearing a blue shirt, blue latex gloves, a black bandana, and sunglasses approached on the passenger side, pointed a gun at them through the window, and instructed them not to move. Mr. Hall stated that the man took a gun from Mr. Ike's lap and instructed Mr. Hall to go back inside his house. Mr. Hall said he heard four or five gunshots as he was entering his house. The State asserted that Mr. Hall was not truthful.

According to the State's summary of proof, Ms. Cartwright saw Mr. Ike's car park and Mr. Hall exit his home, enter Mr. Ike's car, and then exit Mr. Ike's car after a few minutes. An African-American man holding a silver gun and wearing a white shirt, khaki pants, and glasses ran from Felicia Avenue to Mr. Ike's car. Mr. Hall was calmly walking toward his house and entered through the front door. Ms. Cartwright saw Mr. Ike being assaulted, went inside, and heard several gunshots. She then saw an SUV drive down the street at a high rate of speed toward Charlotte Avenue. Mr. Rod Fuller called the police to report "six gunshots fired at a male black, white shirt, blue Impala TN tag G2390F." Police officers who responded did not locate anything at the scene because Mr. Ike had run into the adjacent wooded area where he died from multiple gunshot wounds. Mr. Ike's body was located in the wooded area on August 14.

On August 9, at approximately 7:05 p.m., officers were dispatched to Gallatin Pike where a car had wrecked in a ditch near Home Depot. Mr. Beverly had been shot, and Mr. March was dead from gunshot wounds inside the car. Witnesses at Pep Boys saw the Defendant get out of the car and run behind Home Depot. He was found hiding in a dumpster where he also had discarded his cell phone.

Mr. Beverly told the police that while he was in his car talking to Mr. Justin Parson at Sunnyview Court, two African-American men approached him with guns and kidnapped him. Mr. Parson confirmed the events. The Defendant drove; Mr. Beverly was in the front passenger seat; and Mr. March was in the back seat. The Defendant told Mr. Beverly that he was going to die because he "snitched" on the Defendant's cousin. Mr. Beverly offered the Defendant $30,000 to let him go. Mr. Beverly called his brother, Mr. Wilson, and stated that he had been kidnapped. The Defendant instructed Mr. Wilson to meet them at a bowling alley with $30,000 or Mr. Beverly would be killed. The Defendant told Mr. Beverly to watch television because he had been on a killing spree. Mr. March was holding both guns, and Mr. Beverly decided to grab the guns. During a struggle, Mr. Beverly was shot and pretended to be seriously injured. Mr. Beverly decided to attempt to grab the guns again, and during a struggle, he bit off part of Mr. March's ear. The Defendant and Mr. March were shot, and the car wrecked. After the accident, witnesses saw muzzle flashes and the Defendant exit the car and run.

A Smith & Wesson .40 caliber pistol and a .45 caliber black and brown pistol were recovered from the scene. An examination of the firearms revealed that the .40 caliber pistol was used to kill Mr. Ike. The Defendant's cell phone had multiple photographs of him holding a similar pistol. A trace of the pistol revealed that it had been taken during the burglary of Mrs. McGinnis's home in 2011. Mrs. McGinnis stated that the Defendant had been to her home days prior to the burglary. The Defendant knowingly possessed the stolen pistol on the day that he killed Mr. Ike and kidnapped Mr. Beverly.

During an evidentiary hearing on the Defendant's motion on December 4, 2014, the Defendant presented the testimony of Detective Holman, who was present when Mr. Ike's body was discovered in the area of 33rd Avenue and Felicia Street in west Nashville. The incidents involving Mr. Beverly occurred around Sunnyview Court in north Nashville and ended in Madison. Detective Holman agreed that 33rd Avenue North and Sunnyview Court are approximately six and one-half miles apart, which is a ten to fifteen-minute drive or longer during rush hour. He also agreed that Gallatin Pike where Mr. Beverly's car was found was approximately fourteen miles from Sunnyview Court.

Detective Holman testified that while investigating Mr. Ike's death, he spoke to Mr. Hall, who stated that Mr. Ike came to his home to sell him marijuana. Mr. Hall stated that during the transaction, two African American men approached the car, ordered Mr. Hall out of the vehicle, and instructed him to return to his home. Detective Holman agreed that he had received information from Mr. Kelvin Jordan that the incident had involved a drug transaction. Detective Holman stated that his investigation led him to believe that Mr. Hall was involved in getting Mr. Ike to his home so that the Defendant could locate Mr. Ike, and Detective Holman noted text messages from the Defendant stating that he was searching for Mr. Ike. Mr. Hall changed his story several times.

Detective Holman testified that although his investigation indicated that Mr. Ike was shot on August 9, 2012, Mr. Ike's body was not located until August 14. The detective was able to narrow the time period during which the shooting occurred based upon text messages, including a text message from Mr. Hall to the Defendant on August 9 at 6:23 p.m., instructing the Defendant to "throw" his cell phone. Mr. Rod Fuller, Mr. Hall's brother, stated that he received a call from his sister, Ms. Janita Hall, about shots being fired. Ms. Hall allowed Detective Holman to look at her cell phone, and he determined that Ms. Hall called Mr. Fuller at 6:52 p.m. Ms. Hall told Detective Holman that she did not call Mr. Fuller until a "good quantity of time" after the shooting. Mr. Fuller did not call 9-1-1 until he returned home shortly after 7:00 p.m.

When questioned regarding any information suggesting why Mr. Ike was targeted, Detective Holman recalled "some information that was developed considering his

involvement with being a police informant." Detective Holman did not recall having any information establishing that either the Defendant or Mr. March knew that Mr. Ike was an informant. Detective Holman acknowledged that Mr. Ike had not provided information to the police about the Defendant or Mr. March. Detective Holman stated that Mr. Beverly told officers that he was told that he was targeted because he had acted as an informant and had provided law enforcement with information regarding the Defendant's cousin. Detective Holman acknowledged that while the perpetrators requested a ransom during Mr. Beverly's abduction, there was no indication of any ransom or request for money from Mr. Ike. Although Mr. Ike had been robbed previously, there was no evidence of a robbery around the time of his murder, as he was found with money in his hand and his cell phone near him.

Although Mr. Hall and the Defendant exchanged text messages regarding Mr. Ike, Detective Holman was not aware of any text messages between Mr. Hall and the Defendant mentioning Mr. Beverly or of any text messages between Mr. Ike and Mr. Beverly. Detective Holman did not recall any text messages stating that people were being targeted because they were cooperating with the State.

Detective Holman acknowledged that officers located Mr. Martindale, one of the individuals with whom the Defendant had exchanged text messages stating that the Defendant was searching for Mr. Ike. Mr. Martindale told officers that he had grown up with the Defendant and Mr. Ike and that his acquaintances commonly ask if one has seen the other one. Detective Holman stated that Mr. Martindale appeared to have been truthful when providing officers with information.

Detective Holman believed the Defendant and Mr. March used Ms. Essence Wade's "minivan-type vehicle" to travel from Felicia Street after shooting Mr. Ike to meet Mr. Beverly. Officers located the vehicle one to two months later, and the vehicle matched the description of the vehicle that eyewitnesses saw on Felicia Street. Detective Holman explained that the vehicle changed hues depending on the sun's reflection and that the vehicle at certain times appeared to have champagne, tan, and green hues.

Detective Holman testified that officers obtained the Defendant's cell phone locations and were able to determine the route that the Defendant would have taken from the scene of Mr. Ike's shooting to the location where Mr. Beverly was abducted. Detective Holman did not believe any witnesses saw the Defendant in possession of his cell phone during that time period. Surveillance video from a CVS that was taken after Mr. Beverly was abducted also was obtained.

On cross-examination by the State, Detective Holman agreed that, based on the timeline, including the fact that the 9-1-1 call from the car accident on Gallatin Road

involving Mr. Beverly was made at 7:05 p.m., Mr. Ike's shooting and Mr. Beverly's abduction occurred within one hour of each other. The .40 caliber pistol that was used to kill Mr. Ike was recovered from the scene on Gallatin Road. Detective Holman stated that the .40 caliber pistol appeared similar to the gun that the Defendant was holding in photographs found on his cell phone. The serial number on the pistol had been tampered with, but the TBI was able to recover it. Officers learned that the pistol had been reported stolen on April 2, 2011, during a home burglary. Detective Holman interviewed the owner, who knew the Defendant and said the Defendant had been in her home the day before the burglary. The owner also recalled seeing the Defendant's phone number on her caller ID the day prior to the burglary.

Detective Holman agreed that based on the text messages and the correlation of the calls, it appeared that the Defendant was asking Mr. Hall to assist him in luring Mr. Ike to that location. Detective Holman also agreed that a cell phone tower ping from the Defendant's cell phone to a tower in west Nashville prior to the shooting correlated to a text message from the Defendant to his wife which stated, "I'm not with no b***h but my 40." Text messages that occurred over several weeks beginning in July established that the Defendant was searching for Mr. Ike. Detective Holman agreed that some of the text messages appeared to indicate that the Defendant's electronic monitoring device was hindering his attempt to locate Mr. Ike.

Detective Holman testified that Ms. Cartwright, who lived across the street from Mr. Hall, stated that while she was on her front porch with her grandmother, she saw what was later identified at Mr. Ike's car park outside Mr. Hall's house and Mr. Hall get into the car. Ms. Cartwright stated that as the men ran up to the car, Mr. Hall calmly got out of the car and walked back into his house as if nothing unusual were occurring. She stated that when she saw a man running up to the car while holding a weapon, she got her grandmother into the house and then heard gunshots. On redirect examination, Detective Holman testified that Ms. Cartwright never viewed a photographic line-up that included the Defendant's photograph because the detective believed that Ms. Cartwright was too far away from the shooting to provide an identification.

Detective Robert Hansen testified for the State that according to Mr. Beverly, the Defendant told Mr. Beverly that he was going to kill Mr. Beverly because he was a "snitch" and that Mr. Beverly needed to watch the news because the Defendant and Mr. March had been on a "killing spree." On cross-examination, Detective Hansen testified that he believed that Mr. Beverly had stated that both the Defendant and Mr. March made these comments. Detective Hansen elaborated, "The killing spree could have come from Mr. March—or—yeah, Mr. March but Mr. Brown had told them they had been—you know."

- 36 -

On redirect examination, Detective Hansen testified that the Defendant made a statement to another detective at the hospital. The Defendant reported that Mr. Beverly was armed with two guns and robbed him on Kings Lane. The Defendant stated that he had known Mr. Beverly his entire life and purchased marijuana from him. The Defendant said that he met Mr. Beverly, who produced two guns, ordered the Defendant to drive, and directed him where to go. The Defendant and Mr. March were in the front seats, while Mr. Beverly was in the backseat. The Defendant reported that Mr. Beverly shot Mr. March after Mr. March tried to take the guns away from Mr. Beverly. One of the bullets struck the Defendant, who wrecked and fled the scene. Detective Hansen acknowledged that the Defendant portrayed himself as the victim of a kidnapping and maintained that Mr. Beverly possessed the .40 caliber pistol.

Detective Hansen interviewed Mr. Beverly, who stated that he attempted to call his brother during the kidnapping but that the connection was bad. The Defendant then called Mr. Beverly's brother and threatened to kill Mr. Beverly unless his brother gave him $30,000. When interviewed by police, Mr. Beverly's brother corroborated Mr. Beverly's statement regarding the ransom demand.

The trial court entered a written order in March 2015, denying the Defendant's motion to sever both the defendants and the offenses. The trial court denied the severance of the defendants based upon the State's indication that it did not plan to introduce Mr. Hall's statements at trial. With respect to the severance of the offenses, the trial court did not find that offenses were mandatorily joined pursuant to Tennessee Rule of Criminal Procedure 8(a) but found that they were permissively joined pursuant to Rule 8(b). The trial court found that the Defendant did not have a right to a severance of the offenses pursuant to Rule 14(b)(1) because the offenses were part of a common scheme or plan and that the evidence of one of the offenses was admissible in the trial of the other offenses.

The trial court found that the offenses were directed toward a common goal or purpose in that "the continuing plan at issue involved the Defendant's common goal of eliminating individuals considered 'snitches' [who] had cooperated with law enforcement against him or members of his family." The trial court noted that the offenses occurred within an hour and in close proximity to each other. The trial court also noted that Mrs. McGinnis could identify the Defendant as being in her house in 2011 prior to the firearm being stolen and that the firearm was used in the offenses involving Mr. Ike and Mr. Beverly.

The trial court found that the evidence from the offenses involving Mr. Beverly was probative to the charges of the first degree premeditated murder of Mr. Ike and unlawful possession of a handgun by a convicted felon because the evidence of the

offenses involving Mr. Beverly established that the Defendant had possession of the firearm used to kill Mr. Ike. The trial court found that the Defendant's statement that he was on a "killing spree" was an admission evidencing intent. The trial court stated that the evidence of the Defendant's failure to appear in court on the date of the offenses is relevant to premeditation and established his actions in avoiding detection so that he could commit the later offenses. The trial court concluded that the evidence of the offenses involving Mr. Beverly and the stolen firearm were admissible in a trial of the murder of Mr. Ike, that the probative value of the evidence of the Mr. Beverly offenses was "extremely high" and "far outweigh[ed]" any prejudicial effect, and that the "events of each crime are intertwined and inseparable."

In October 2015, Mr. Hall filed a motion to sever the charge of first degree premeditated murder of Mr. Ike from the remaining counts of the indictment with which only the Defendant was charged. Mr. Hall argued that there was no proof that the Defendant or Mr. Hall knew about Mr. Ike's cooperation with authorities and that as a result, the evidence was irrelevant to whether the offenses were part of a common scheme or plan. Mr. Hall maintained that at the prior severance hearing, evidence of a common scheme or plan amounted to hearsay, multiple-level hearsay, and stipulations and that Mr. Hall did not have the opportunity to contest the proof of the common scheme or plan. The Defendant also filed a second motion to sever Mr. Hall as a co-defendant.

A series of evidentiary hearings were held in November 2015 on the motions as well as on other motions filed by both defendants, including the Defendant's motion to exclude evidence of Mr. Ike's cooperation with the police as a confidential informant. In response to the Defendant's second motion to sever the defendants, the State presented the testimony of Detective High, whose testimony regarding his review of cell phone call detail records and the cell towers utilized in making those calls mirrored his testimony at trial.

Detective Holman testified that officers located Mr. Ike's body as Detective Holman was speaking to Mr. Hall in front of his residence. Mr. Hall told detectives that he had contact with "Tim" before Mr. Ike arrived at Mr. Hall's house several days earlier. Mr. Hall agreed to speak to detectives at the precinct, and as a result, law enforcement developed information that the Defendant was involved in Mr. Ike's death.

In response to questioning by Mr. Hall's attorney, Detective Holman testified that he did not know whether there was any direct evidence that the Defendant was aware of Mr. Ike's status as a confidential informant other than the incident relating to Mr. Beverly and clarified "them telling him they were going to kill the snitches and so on and so forth." Detective Holman believed there was evidence that the Defendant knew Mr. Ike had cooperated with the police, but Detective Holman was unable to recall what that

evidence was. Detective Holman was unsure whether there was any evidence that Mr. Hall was aware of Mr. Ike's cooperation with the police. Detective Holman was unaware of any link between those who witnessed the wreck involving the Defendant and Mr. Beverly and the shooting of Mr. Ike. He also did not have any evidence that Mr. Hall knew of the plan to abduct Mr. Beverly.

When questioned by the State, Detective Holman testified that a review of the Defendant's cell phone established that the Defendant communicated with Mr. Hall following the shooting of Mr. Ike. The Defendant's cell phone also showed that prior to his last communication with Mr. Hall, and within minutes of Mr. Ike's murder, the Defendant communicated with Mr. Beverly. In response to questioning by Mr. Hall's counsel, Detective Holman testified that he did not believe that the Defendant provided any information to Mr. Hall via text message or that Mr. Hall mentioned Mr. Beverly in any text message.

In response to questioning by defense counsel, Detective Holman testified that the only evidence suggesting that the Defendant was retaliating against Mr. Ike due to Mr. Ike's cooperation with the police was the Defendant's statements to Mr. Beverly during the abduction. Detective Holman testified that the statements of the Defendant and Mr. March were "something about they were going around and killing snitches and watch the news. And we've already killed 3 or 4, however many it was. I don't recall the exact exchange." Detective Holman noted that the Defendant had sent text messages to others searching for Mr. Ike and that there were prior reports where the Defendant had been involved in robbing Mr. Ike. On cross-examination by the State, Detective Holman agreed that while in Mr. Beverly's car and after killing Mr. Ike, the Defendant called someone and instructed the person to "watch the news."

Mr. Hall's counsel also presented the testimony of Mr. Beverly, who maintained that he did not know Mr. Hall and that Mr. Hall was not involved in the abduction. On cross-examination by the State, Mr. Beverly identified the Defendant and Mr. March as his abductors. Mr. Beverly denied providing information to the federal authorities in 2011 or 2012 that led to several member of his community being charged with criminal offenses. He stated that several people believed he had provided such information.

In response to questioning by defense counsel, Mr. Beverly testified that the Defendant accused him of "snitching" on the Defendant's cousin. Mr. March told Mr. Beverly that "we killed somebody today." Mr. Beverly stated that the Defendant and Mr. March never mentioned Mr. Ike to him. Mr. Beverly maintained that the Defendant "didn't say he was killing snitches. He just said I snitched on his cousin."

The trial court subsequently entered an order severing the cases of the Defendant and Mr. Hall based upon Mr. Hall's intention to present a defense implicating the Defendant. As a result, the trial court found that Mr. Hall's motion to sever the offenses was moot.

## B. Analysis

When two or more offenses are joined in the same indictment, as in this case, a defendant may contest the joinder by filing a motion to sever offenses. Multiple offenses *shall* be joined in the same indictment if the offenses are "based on the same conduct or arise from the same conduct or arise from the same criminal episode[,]" within a single court's jurisdiction, and known to the prosecutor at the time of the return of the indictment. Tenn. R. Crim. P. 8(a)(1). Under the mandatory joinder provisions, a trial court shall grant a severance of offenses prior to trial if the trial court finds "a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." Tenn. R. Crim. P. 14(b)(2)(A). Multiple offenses *may* be joined in the same indictment if "the offenses constitute parts of a common scheme or plan; or … they are of the same or similar character." Tenn. R. Crim. P. 8(b). Where joinder is permissive pursuant to Rule 8(b), "the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1). The trial court found that joinder of the offenses was permissive rather than mandatory, and the State does not contest this finding on appeal. Accordingly, we must determine whether the trial court erred in denying the Defendant's motion to sever the offenses under the standards set forth in Rule 14(b)(1).

A trial court's decision to consolidate or sever offenses pursuant to Rule 8(b) and Rule 14(b)(1) is reviewed as an abuse of discretion. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). "An abuse of discretion in this context implies that the trial court applied an incorrect legal standard or reached a decision against logic or reasoning which caused an injustice to the complaining party." *State v. Denton*, 149 S.W.3d 1, 12 (Tenn. 2004). A defendant has the burden of showing that he was "clearly prejudiced" by the trial court's denial of a motion to sever the offenses. *State v. Hall*, 976 S.W.2d 121, 146 (Tenn. 1998). The trial court must hold a hearing before denying a severance motion. *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). The trial court must base its ruling on the motion on the evidence and arguments presented at the hearing, and, thus, this court's review on appeal is limited "to that evidence, along with the trial court's findings of fact and conclusions of law." *Spicer v. State*, 12 S.W.3d 438, 445 (Tenn. 2000); *see State v. Garrett*, 331 S.W.3d 392, 404 (Tenn. 2011) (conducting an analysis based upon the evidence presented at trial instead of only the evidence presented at a hearing due to the trial court's failure to hold a pretrial hearing).

The State joined multiple offenses in a single indictment pursuant to Rule 8(b), and the Defendant filed a motion to sever the offenses. In such a situation, Rule 14(b)(1) places the burden on the State to establish in the trial court that "the offenses are a part of a common scheme or plan *and* the evidence of each crime would be admissible in the trial of the other." *Denton*, 149 S.W.3d at 13. In considering a defendant's motion to sever offenses, the trial court must apply the severance provisions of Rule 14(b)(1) and not the "same or similar character" standard in Rule 8(b). *Spicer*, 12 S.W.3d at 443.

In examining a trial court's ruling on a severance motion, the primary consideration is whether the evidence of one offense would be admissible in the trial of another if the offenses remained severed. *Id*. at 445. Essentially, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" *Id.* (quoting *State v. Moore*, 6 S.W.3d 235, 239 (Tenn. 1999)). The trial court must sever the offenses unless it concludes from the evidence and arguments presented at the hearing on the motion that:

> "(1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of [one] offense is relevant to some material issue in the trial of all the other offenses; and (3) the probative value of the evidence is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant."

*Garrett*, 331 S.W.3d at 403 (quoting *Spicer*, 12 S.W.3d at 445) (citations omitted).

### 1. Common Scheme or Plan

Our supreme court has recognized that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." *Moore*, 6 S.W.3d at 240 n.7. There are three types of common schemes or plans: "(1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." *Shirley*, 6 S.W.3d at 248. The State asserts that the offenses were part of a larger, continuing plan or conspiracy and that the offenses were all part of the same criminal transaction.

A larger, continuing plan or conspiracy relates to "crimes committed in furtherance of a plan that has a readily distinguishable goal, not simply a string of similar offenses." *Denton*, 149 S.W.3d at 15. This category "encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). The evidence sought is "'of a

- 41 -

working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial.'" *State v. Jawaune Massey*, No. E2013-01047-CCA-R3-CD, 2014 WL 3661490, at *31 (Tenn. Crim. App. July 23, 2014) (quoting *State v. Cayle Wayne Harris*, No. M2004-00049-CCA-R3-CD, 2005 WL 2255488, at *7 (Tenn. Crim. App. Aug. 23, 2005)). A common scheme or plan is not established through "shared motivation for two otherwise unrelated crimes." *State v. Prentice*, 113 S.W.3d 326, 332 (Tenn. Crim. App. 2001) (citing *State v. Adams*, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992)). Each of the consolidated offenses must serve to further the goal or plan in existence at the time of the commission of the first offenses. *Jawaune Massey*, 2014 WL 3661490, at *32. Where the State has not established evidence of a "'working plan' whereby the subsequent offenses are predictable or probable from the defendant's determination to commit the initial offenses (or vice versa)," the subsequent offenses cannot constitute parts of a larger, continuing plan. *Id.* at *31.

In denying the Defendant's severance motion, the trial court found that the offenses "involved the Defendant's common goal of eliminating individuals considered 'snitches' [who] had cooperated with law enforcement against him or members of his family." The State maintains that the trial court reached the correct result, "even if its findings do not completely encompass that correct result." The State asserts that the offenses were part of a larger, continuing plan to eliminate perceived informants.

While evidence was presented during the pretrial hearings establishing that the Defendant mistakenly believed that Mr. Beverly was an informant, no evidence was presented either during the initial hearings or the subsequent hearings on Mr. Hall's severance motion to establish that the Defendant knew Mr. Ike was a confidential informant. The record does not support a working plan linking the murder of Mr. Ike and the offenses against Mr. Beverly such that the offenses against Mr. Beverly were predictable or probable based upon the Defendant's determination to commit the murder of Mr. Ike. The evidence presented during the pretrial hearings failed to demonstrate that a larger, continuing plan to eliminate perceived informants existed such that all of the charges should be tried in the same trial.

The State asserts that, although not found by the trial court, the offenses were all part of the same criminal transaction. "The same transaction category involves crimes which occur within a single criminal episode." *Hallock*, 875 S.W.2d at 290. Our supreme court has recognized that offenses within a "single criminal episode"

> "are generated by separate physical actions. The actions may be committed by separate defendants. In other respects, however, they are similar to same conduct offenses: they occur simultaneously or in close sequence, and they occur in the same place or in closely situated places. A critical

- 42 -

characteristic of single episode offenses, particularly in cases involving otherwise unrelated offenses or offenders, is the fact that proof of one offense necessarily involves proof of the others."

*State v. Johnson*, 342 S.W.3d 468, 474-75 (Tenn. 2011) (quoting 2 ABA Standards for Criminal Justice § 13-1.2 cmt., at 13.10) (footnotes omitted). The acts must occur "simultaneously or in close sequence" and "in the same place or in closely situated places." *Id.* at 475.

The requirement that "proof of one offense necessarily involves proof of the others" means that "the proof of one offense must be inextricably connected with the proof of the other" or that "the proof of one offense forms a substantial portion of the proof of the other offense." *Id.* (quotations omitted). As this court has stated, "'crimes admitted as part of the "same transaction" should be limited to those so inextricably connected in time, place, or manner that the jury would be unable to comprehend the essential nature of the charged crime without hearing evidence of the "other" crime.'" *State v. John Allen Murphy, Jr.*, No. M2007-02416-CCA-R3-CD, 2009 WL 1643442, at *8 (Tenn. Crim. App. June 12, 2009) (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[13] (5th ed. 2005)).

While it appears that the murder of Mr. Ike and the offenses against Mr. Beverly occurred within a short time period of each other, they involved separate acts against different victims that occurred at different times, by different means, through the actions of different perpetrators, and in different areas of Nashville. The State, in contending that the offenses constituted one criminal transaction, relies upon evidence that the same firearm was used in both the murder of Mr. Ike and the offenses against Mr. Beverly and that the Defendant and/or Mr. March boasted to Mr. Beverly of having killed someone else earlier in the day. We agree that this evidence is relevant to support the murder charge, but "more than mere relevancy is required." *Johnson*, 342 S.W.3d at 476. We cannot conclude that proof that the Defendant and Mr. March abducted Mr. Beverly, drove around the Nashville area, demanded a ransom from Mr. Beverly's brother, were involved in a struggle inside the car during which Mr. Beverly was shot, and were involved in a second struggle during which Mr. March was shot and killed formed "a substantial portion of the proof" of Mr. Ike's murder or was "inextricably connected" with Mr. Ike's murder. Rather, we agree with the Defendant that the State could have presented limited proof during a separate trial on the murder charge regarding the Defendant's possession of the murder weapon shortly after the murder occurred and his boasting to Mr. Beverly about killing someone else earlier in the day.

The State maintains that evidence of Mr. Ike's murder was "relevant" to Mr. Beverly's abduction as corroborating Mr. Beverly's testimony regarding the threats made

to him by Mr. March and the Defendant. The State further maintains that evidence that the Defendant had just killed someone "makes it far less likely that Mr. Beverly had identified the wrong person as his abductor." As we have noted, relevancy is not the standard for determining whether offenses constitute the same criminal transaction. Furthermore, the State presented no evidence during any of the severance hearings to suggest that identity would be at issue during the trial of the offenses against Mr. Beverly. Rather, an officer testified that following Mr. Beverly's abduction, the Defendant gave a statement to the police in which he maintained that he was a victim in the offense and that Mr. Beverly abducted him.

We conclude that the evidence presented at the severance hearings failed to establish that the offenses were part of a common scheme or plan. Thus, the trial court erred in failing to sever the offenses.

## 2. Harmless Error

Because a trial court's decision to grant or deny a severance motion under Tennessee Rule of Criminal Procedure 14(b)(1) primarily involves an evidentiary question, the effect of an error in denying a severance motion is determined based upon the same standard as other non-constitutional evidentiary errors in that "'the defendant must show that the error probably affected the judgment before reversal is appropriate.'" *Denton*, 149 S.W.3d at 15 (quoting *Moore*, 6 S.W.3d at 242). The line between harmless error and prejudicial error is directly proportional to the degree by which the evidence exceeds the standard required for conviction. *Garrett*, 331 S.W.3d at 405 (citing *Spicer*, 12 S.W.3d at 447). "'The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome on its merits.'" *Dotson*, 254 S.W.3d at 388 (quoting *State v. Toliver*, 117 S.W.3d 216, 231 (Tenn. 2003)). However, this court must focus not only on the weight of the evidence, but on "'the actual basis of the jury's verdict.'" *Garrett*, 331 S.W.3d at 405 (quoting *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008)). Thus, "[t]he key question is whether the error likely had an injurious effect on the jury's decision-making process. If the answer is yes, the error cannot be harmless." *Dotson*, 254 S.W.3d at 389.

While the evidence was sufficient to support the Defendant's conviction for first degree premeditated murder under a theory of criminal responsibility, the proof was not overwhelming and primarily consisted of circumstantial evidence. In contrast, the evidence supporting the convictions in which Mr. Beverly was the victim was overwhelming, and Mr. Beverly's testimony was corroborated by the testimony of witnesses and physical evidence.

The prosecution argued extensively in its opening statement and closing arguments regarding the link between the murder of Mr. Ike and the offenses against Mr. Beverly. *See Garrett*, 331 S.W.3d at 406 (considering the extent to which the prosecutor attempted to link the offense with the other erroneously consolidated offenses in its opening statement and closing arguments). For example, during opening statements, the prosecutor stated that the evidence "will give you premeditation. Premeditation that Timothy Brown was doing exactly what he said he was doing to Alan Beverly. He was killing snitches. Chijoke Ike died. He was murdered." The prosecutor began closing arguments with the following:

> May it please the Court, ladies and gentlemen of the jury, now you know Timothy Brown murdered Chijoke Ike [and] that he tried to do the same thing to Alan Beverly. But Alan Beverly had a chance that Chijoke Ike was [n]ever afforded. Alan Beverly had a chance to fight. He realized he was going to have to fight for his life and that's exactly what he did. Something Chijoke Ike could not do.

These comments "were designed to encourage the jury to bolster the proof of each crime with the proof of the other." *Id.*; *see Dotson*, 254 S.W.3d at 387 (stating that a "jury should not 'be tempted to convict based upon a defendant's propensity to commit crimes rather than … [upon] evidence relating to the charged offense'") (quoting *Spicer*, 12 S.W.3d at 448).

The trial court's failure to sever the offenses allowed the State to bolster its proof of the first degree murder charge with evidence that, on the same day of the offense, the Defendant and Mr. March abducted Mr. Beverly at gunpoint, threatened to kill him, demanded a ransom, were involved in an altercation with Mr. Beverly during which the Defendant shot him in the stomach, and were involved in a second altercation with Mr. Beverly during which Mr. March was shot and killed. Under these circumstances, we conclude that the erroneous failure to sever the offenses more probably than not affected the verdict on the charge of first degree premeditated murder of Mr. Ike. *See* Tenn. R. App. P. 36(b); *Dotson*, 254 S.W.3d at 390. Therefore, the error cannot be classified as harmless with regard to the Defendant's conviction for first degree murder. As our supreme court has recognized, "lenience in the enforcement of such an established rule of procedure would not encourage future compliance with that rule." *See Dotson*, 254 S.W.3d at 390. Accordingly, we reverse the Defendant's conviction for first degree murder and remand the case for a new trial on this charge.

We have concluded that the evidence was insufficient to support the Defendant's theft conviction. Given the lack of evidence to support the conviction, we also conclude that the erroneous failure to sever the offenses more probably than not affected the

verdict on the theft charge. *See* Tenn. R. App. P. 36(b). Accordingly, this is a separate basis for reversal of the theft conviction, which we have concluded above must be reversed and the charge dismissed.

As to the remaining convictions, the evidence to support the convictions was overwhelming. The evidence clearly established the Defendant's failure to appear in court on the day of the offense, and the Defendant did not specifically challenge the charge at trial. With regard to the offenses involving Mr. Beverly, identity was not at issue, and the Defendant did not deny being inside Mr. Beverly's vehicle. Instead, the Defendant argued to the jury that Mr. Beverly's testimony regarding the events was not credible. However, Mr. Beverly's testimony was supported by extensive corroborative evidence, including the testimony of witnesses and the physical evidence. We conclude that the proof supporting the remaining convictions is "sufficiently strong" such that the jury likely would have convicted the Defendant of these remaining convictions even had it not heard any evidence about the first degree murder of Mr. Ike. *See Garrett*, 331 S.W.3d at 408. The trial court's error in failing to sever the offenses does not appear to have affirmatively affected the jury's verdict as to these remaining offenses, and the Defendant is not entitled to relief on these offenses.

### III. Admission of Rule 404(b) Evidence

The Defendant contends that the trial court erred in allowing the State to present evidence that he was on probation, was arrested after committing a new offense while on probation, obtained his release from custody by agreeing to cooperate with police, and failed to notify police before or after removing his GPS monitoring device. He maintains that such evidence was not admissible as substantive proof under Tennessee Rule of Evidence 404(b). The State responds that the trial court did not abuse its discretion in admitting the evidence.

### A. Pretrial Proceedings

Prior to trial, the Defendant filed a motion to exclude evidence of his prior cooperation with the police and his gang membership. The State subsequently filed a notice of its intent to introduce evidence pursuant to Rule 404(b). The State sought to introduce the following evidence at trial:

1. The Defendant was on probation for a ten-year term for a felony offense.

2. The Defendant was arrested by Detective Adam Weeks on a new charge, which resulted in the issuance of a probation violation warrant and the Defendant's incarceration.

- 46 -

3. The Defendant offered to assist law enforcement by providing information on members of the Real Kamp gang, specifically those listed on the proffer statement provided to Detective Weeks and the State. One or more of those listed in the statement were believed to have shot at officers who were sitting in an unmarked police car. The State agreed to release the Defendant on bond with a GPS monitoring device to allow him to procure such information and agreed that the Defendant's cooperation would be considered in the future resolution of his probation violation charge.

4. The Defendant failed to provide any substantial information to the officers.

5. The Defendant did not notify officers immediately before or after removing his GPS monitoring device.

6. On August 9, 2012, the Defendant set up a meeting with Mr. Beverly for the alleged reason of purchasing marijuana.

The State maintained that the evidence was necessary to establish the Defendant's connection and relationship with Mr. March, the Defendant's failure to communicate his plans with Mr. March to the police, the Defendant's knowledge of Mr. March's potentially violent nature, and a motive for "killing snitches" to establish that the Defendant himself was not a "snitch." The State further maintained that the absence of such evidence would leave a contextual void and that the jury would be unable to understand the true relationship between the Defendant and Mr. March.

After a pretrial hearing during which Sergeant Smith, Detective Weeks, and Mr. Omatu testified, the trial court entered an order allowing the State to present the following evidence:

1. The Defendant was previously on probation and was arrested on new charges.

2. The Defendant offered to assist police officers by providing information regarding individuals named in a proffer note, including Mr. March. The State agreed to release the Defendant on bond with a GPS monitoring device to allow him to provide such information. The State agreed that the Defendant's cooperation would be taken into consideration in the future resolution of his new charges.

- 47 -

3. The Defendant did not notify the police immediately before or after removing his GPS monitoring device.

4. On August 9, 2012, the Defendant set up a meeting with Mr. Beverly for the alleged reason of purchasing marijuana.

The trial court found that information relating to the Defendant's probation, his subsequent charges, and his removal of his GPS monitoring device were relevant to the Defendant's intent to hide his locations and his action and to show a contextual history of how the Defendant became involved in the series of events in the case. The trial court also found that the Defendant's agreement with the State to provide information about individuals, including Mr. March, was relevant to establish the Defendant's relationship with Mr. March and how they became involved in the offenses. The trial court noted that the relevancy of the Defendant's relationship with Mr. March and evidence of the Defendant's intent is of greater importance given the State's reliance on a theory of criminal responsibility. The trial court also found that evidence of the Defendant's setting up a meeting with Mr. Beverly to purchase marijuana was probative to show that the lack of mistake or to negate the assertion that the Defendant was in Mr. Beverly's vehicle "by happenstance." The trial court concluded that the acts were established by clear and convincing evidence but decided to "curtail" the evidence set forth in the State's notice to ensure that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

During Sergeant Smith's testimony at trial, the State sought to question him about the information the Defendant provided to him pursuant to the confidential informant agreement. The defense objected, arguing that the Defendant's failure to provide information in accordance with the terms of the agreement was a "bad act" subject to the provisions of Rule 404(b). During a jury-out hearing, Sergeant Smith testified about the information that the Defendant provided and did not provide regarding Mr. March. Sergeant Smith also testified regarding the Defendant's failure to provide information regarding others listed in the proffer.

The trial court did not allow the State to question Sergeant Smith regarding the information that the Defendant did and did not provide regarding other gang members. In response to questioning by the trial court, defense counsel acknowledged that he might maintain during closing arguments that Mr. March was solely responsible for committing the offenses. The trial court found that, as a result, the Defendant's relationship with Mr. March, including the information that the Defendant did and did not provide to the police, was highly relevant. The trial court stated that it did not believe that the information that the Defendant provided to the police regarding Mr. March's actions constituted "bad acts" of the Defendant subject to the provisions of 404(b). The trial court found that,

regardless, such evidence was established by clear and convincing evidence and that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

## B. Analysis

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Rule 404(b) has been described as a rule of exclusion rather than inclusion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). "Trial courts have been encouraged to take a 'restrictive approach of [Rule] 404(b) ... because "other act" evidence carries a significant potential for unfairly influencing a jury.'" *Id*. (quoting *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)).

Evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme," or contextual background. *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013); *see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Evidence may be admitted for these purposes if the following requirements have been met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

If the trial court has substantially complied with the procedure mandated by Rule 404(b), a trial court's decision to admit or exclude evidence pursuant to Rule 404(b) is reviewed under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion when "'it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party.'" *Jones*, 450 S.W.3d at 892 (quoting *State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013)). If the trial court has failed to substantially comply with the

procedural mandates of Rule 404(b), our standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-53).

The trial court held an evidentiary hearing outside the jury's presence and found that the evidence was admissible for various non-propensity purposes, that the bad acts had been established by clear and convincing evidence, and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The trial court substantially complied with the procedural mandates of Rule 404(b). Therefore, our review is abuse of discretion.

On appeal, the Defendant does not challenge the admission of evidence that he contacted Mr. Beverly prior to the offenses for the purported purpose of purchasing marijuana. He also does not challenge the trial court's finding that the State established the various "bad acts" by clear and convincing evidence. Rather, he challenges the trial court's findings that the evidence was relevant for a material issue at trial and that the probative value of the evidence was not outweighed by the danger of unfair prejudice.

We conclude that the Defendant's removing of his GPS monitoring device a few days prior to the offenses without notifying the police was relevant to the issue of intent and premeditation. Text messages from the Defendant's cell phone established that he had been searching for Mr. Ike for several weeks prior to the murder. On July 31, the Defendant received a text message after his 9:00 p.m. curfew, notifying him of Mr. Ike's location. The Defendant responded that while he was "[i]n tonight," "ima cut dis s**t off my legg n get da thuggn soon." He instructed the person to keep him "posted" on Mr. Ike. The evidence suggests that the Defendant removed his GPS monitoring device without notifying the police in order to avoid detection so he could commit the murder of Mr. Ike. The trial court correctly found that the probative value of such evidence was not outweighed by the danger of unfair prejudice.

An agreement to assist the police by acting as an informant and the terms of that agreement are not "other crimes, wrongs, or acts" of the Defendant subject to the provisions of Rule 404(b). The information provided by the Defendant to the police regarding the bad acts of various gang members, including Mr. March, also does not constitute "other crimes, wrongs, or acts" of the Defendant subject to Rule 404(b). *See State v. DuBose*, 953 S.W.2d 649, 653 (Tenn. 1997) ("Evidence of crimes, wrongs or acts, if relevant, are not excluded by Rule 404(b) if they were committed by a person other than the accused.").

Evidence of the Defendant's failure to provide the police with information that he had regarding Mr. March, including his location and cell phone number, was in breach of the Defendant's agreement with the police and was subject to exclusion under Rule

404(b). However, such evidence, along with information that the Defendant provided to the police regarding Mr. March, was relevant to the Defendant's relationship with Mr. March and the Defendant's utilization of Mr. March to assist in committing the offenses. By refusing to provide this information, the Defendant helped Mr. March avoid detection by the police. Evidence of their relationship and the Defendant's knowledge of Mr. March's prior activities was especially probative given the State's reliance on a theory of criminal responsibility. The probative value of such evidence is not outweighed by the danger of unfair prejudice. Accordingly, the trial court properly exercised its discretion in admitting this evidence.

Detective Weeks and Sergeant Smith testified that the Defendant was incarcerated on a probation violation. The trial court found that this evidence was relevant to provide a contextual background as to how the Defendant became involved in the case. In *State v. Gilliland*, the Tennessee Supreme Court set forth a test for the admissibility of evidence of other crimes, wrongs, or acts that is relevant only for providing contextual background:

> [W]hen the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

22 S.W.3d 266, 272 (Tenn. 2000). The language of this test is specifically restricted to "evidence of other crimes, wrongs, or acts that is relevant *only* to provide a contextual background for the case." *Id*. (emphasis added); *see Leach*, 148 S.W.3d 42, 58 (Tenn. 2004).

Evidence that the Defendant had been incarcerated on a probation violation was relevant as contextual evidence to explain why the Defendant was wearing a GPS monitoring device and why he agreed to act as a confidential informant. The absence of such evidence would have created a conceptual void in the State's presentation of its case and would have likely resulted in significant jury confusion as to the importance of the Defendant's removal of his GPS monitoring device as proof of intent and premeditation. Such evidence is also relevant to the charge of the Defendant's failure to appear in court on the day of the other offenses. The trial court found that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Thus, the trial court did not abuse its discretion in admitting the evidence.

Furthermore, any error in the admission of the evidence was harmless, as the jury had been made aware that the Defendant had a prior criminal history based upon the parties' stipulation at trial of a prior period of incarceration, evidence that the Defendant was wearing an ankle monitor, and evidence that the Defendant failed to appear in court on two pending cases on the day of the offenses. *See* Tenn. R. App. P. 36(b); *Jones*, 450 S.W.3d at 900 (applying the harmless error standard to the erroneous admission of evidence under Rule 404(b)).

## IV. Admission of Evidence of Mr. Ike's Status as a Police Informant

The Defendant asserts that the trial court erred in admitting evidence that Mr. Ike was a confidential informant for the police. The Defendant contends that the evidence was irrelevant because there was no proof that he was aware of Mr. Ike's status as a confidential informant.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of discretion. *See Pylant v. State*, 263 S.W.3d 854, 870 (Tenn. 2008).

The State presented evidence of Mr. Ike's status as a confidential informant as proof of the Defendant's motive to kill Mr. Ike. However, there was no evidence establishing that the Defendant was aware of Mr. Ike's status as a confidential informant. While the evidence suggested that the Defendant targeted Mr. Beverly due to the Defendant's mistaken believe that Mr. Beverly had served as an informant against the Defendant's cousin, this same motivation cannot be attributed to the Defendant's decision to target Mr. Ike. Absent proof indicating that the Defendant knew that Mr. Ike was a confidential informant, evidence regarding Mr. Ike's status as a confidential informant was irrelevant. *See* Tenn. R. Evid. 401. Therefore, the trial court abused its discretion in admitting the evidence.

Errors in the admission of evidence are typically considered non-constitutional. *Rodriguez*, 254 S.W.3d at 375. As such, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *Id*. at 372 (quoting Tenn. R. App. P. 36(b)).

This evidence did not relate to the Defendant's convictions involving Mr. Beverly, his firearm convictions, his conviction for failure to appear, or his theft conviction. The evidence presented to support the Defendant's convictions involving Mr. Beverly, his firearm convictions, and his conviction for failure to appear were particularly strong. Accordingly, we conclude that the erroneous admission of the evidence was harmless as to these offenses. *See* Tenn. R. App. P. 36(b).

While the State utilized evidence of Mr. Ike's status as a confidential informant as proof of the Defendant's motive to commit the first degree premeditated murder of Mr. Ike, proof of motive is not necessary to sustain a conviction for first degree premeditated murder. *See State v. Bell*, 512 S.W.3d 167, 191 (Tenn. 2015) (noting that motive is not an element of first degree murder). Rather, motive is only one of many factors that may support a finding of premeditation. *See Adams*, 405 S.W.3d at 663. The State argued to the jury that Mr. Ike's status as a confidential informant was the Defendant's motive to kill him, but the State also informed the jury during closing arguments that proof of motive was not necessary to establish first degree premediated murder. At trial, defense counsel questioned witnesses extensively on cross-examination regarding the lack of any connection between the Defendant and those about whom Mr. Ike provided information to the police and the lack of evidence establishing that the Defendant was aware of Mr. Ike's status as a confidential informant. Furthermore, as we have previously discussed, other evidence was presented establishing many of the other factors that support premeditation. Given the other evidence presented at trial to support premeditation and the Defendant's involvement in Mr. Ike's murder and defense counsel's cross-examination of witnesses at trial establishing the lack of any connection between the Defendant and Mr. Ike's actions as a confidential informant, we cannot conclude that the trial court's erroneous admission of the evidence "more probably than not affected the judgment." Tenn. R. App. P. 36(b). Accordingly, the error was harmless.

## V. Denial of Motion to Suppress Cell Phone Records

The Defendant contends that the trial court erred in denying his motion to suppress his cell phone's call data records obtained pursuant to a judicial subpoena. He maintains that the requesting officer's affidavit in support of the issuance of the judicial subpoena did not meet the requirements in Tennessee Code Annotated section 40-17-123(c). In his reply brief, the Defendant asserts that the officers obtained the records without a warrant and without probable cause in violation of the United States Supreme Court's recent opinion in *Carpenter v. United States*, 138 S.Ct. 2206 (2018). The State responds that the Defendant waived his challenge to the validity of the officer's affidavit by failing to file a motion to quash the subpoena within seven days of the service of the subpoena in accordance with section 40-17-123(k). The State also submits that the affidavit met the requirements of section 40-17-123(c) and that any error in the admission of the cell phone

records was harmless. During oral argument before this court, the State argued that even if *Carpenter* applies, the admission of the Defendant's cell phone records was proper based upon the good faith doctrine.

On or around August 17, 2012, eight days following the offenses and three days after Mr. Ike's body was discovered, Detective Holman requested a court order requiring Sprint to provide records of subscriber and call history, cell tower locations, and text messaging for the Defendant's cell phone for the time period between July 30 and August 10, 2012. As grounds for the request, Detective Holman's affidavit provided:

> I, Det. Chad D. Holman, hereby certify that I am a law enforcement officer as defined in Tenn. Code Ann. §39-11-106, and hereby further state as follows: (1) I have reason to believe that a specific criminal offense has been committed or is being committed as identified below; (2) that the production of the requested documents will materially assist in the investigation of such offense and that a sufficient nexus exists between the documents requested and such offense exists because:

> On 8/9/12, Chijoke Ike was murdered near 33rd Ave N and Felicia St, Nashville, Tennessee. Mr. Timothy Brown, the believed owner of this phone, is a suspect in this homicide. Preliminary indications are that Mr. Brown was planning this robbery/homicide prior to the incident taking place. These records are needed to gain further information relating to Mr. Brown's involvement in this homicide.

A criminal court judge signed the order on the same day, requiring Sprint, as the custodian of the records, to provide the requested records to Detective Holman within fourteen days. The return of service, signed by Detective Holman, provided that on the same day, he served a copy of the order to Sprint via facsimile.

In April 2014, the Defendant filed a motion to suppress evidence obtained pursuant to the order. He asserted that the affidavit failed to state with particularity (1) the articulable reasons why the officer believed the records would materially assist in the investigation of the offense and (2) the nexus between the records requested and the offense in accordance with Tennessee Code Annotated section 40-17-123(c). The State filed a response, maintaining that the Defendant's motion was untimely and that the affidavit met the requirements in section 40-17-123.

The trial court entered an order denying the Defendant's motion. The trial court did not address the timeliness of the Defendant's motion. Rather, the trial court found that the affidavit met the requirements in section 40-17-123. The trial court noted that the

affidavit provided the date and location of the offense, a twelve-day range of information needed from the specific cell phone tied to a suspect believed to have planned the offense, and the necessity of the records in order to determine the suspect's involvement in the offense.

In reviewing the trial court's ruling on a motion to suppress on appeal, the party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Bell*, 429 S.W.3d 524, 529 (Tenn. 2014). This court must uphold the trial court's findings of fact, unless the evidence preponderates against them. *Id.* at 528. "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). We review the application of the law to the facts de novo without a presumption of correctness to the trial court's conclusions of law. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

## A.  Sufficiency of the Affidavit

Tennessee Code Annotated section 40-17-123 establishes a procedure to be employed when a law enforcement officer seeks a subpoena "for the production of books, papers, records, documents, tangible things, or information and data electronically stored" for the purpose of investigating a criminal offense. T.C.A. § 40-17-123(a).[1]  An officer must support a request for a subpoena with an affidavit, stating "with particularity" the following:

(1) A statement that a specific criminal offense has been committed or is being committed and the nature of the criminal offense;

(2)  The articulable reasons why the law enforcement officer believes the production of the documents requested will materially assist in the investigation of the specific offense committed or being committed;

(3)  The custodian of the documents requested and the person, persons or corporation about whom the documents pertain;

---

[1] We note that Tennessee Code Annotated section 39-13-610, which was effective in 2014, prohibits a state or local government agency from obtaining the location information of an electronic device absent a search warrant except in limited circumstances.  However, the subpoena in the present case was obtained prior to the enactment of section 39-13-610.

(4)  The specific documents requested to be included in the subpoena; and

(5)  The nexus between the documents requested and the criminal offense committed or being committed.

T.C.A. § 40-17-123(c).  The judge shall grant the request for a subpoena upon finding that the affiant presented "a reasonable basis" for believing that:

(A)  A specific criminal offense has been committed or is being committed;

(B)  Production of the requested documents will materially assist law enforcement in the establishment or investigation of the offense;

(C)  There exists a clear and logical nexus between the documents requested and the offense committed or being committed; and

(D)  The scope of the request is not unreasonably broad or the documents unduly burdensome to produce.

T.C.A. § 40-17-123(d)(1).

A subpoena for the production of documentary evidence directed to or served upon a defendant to a criminal action or the defendant's counsel is prohibited.  T.C.A. § 40-17-123(i).  "A person to whom a subpoena is directed may file a motion to quash or modify the subpoena upon a showing that compliance would be unreasonable or oppressive."  T.C.A. § 40-17-123(k).  Such a motion shall be filed within seven days of service of the subpoena.  *Id.*

The State asserts that the Defendant waived his challenge to the subpoena by failing to file a motion to quash the subpoena within seven days of service of the subpoena in accordance with section 40-17-123(k).  The State does not contest the Defendant's standing to challenge the subpoena.  Rather, the State reasons that because the Defendant had standing to challenge the subpoena in accordance with the Tennessee Supreme Court's opinion in *State v. Harrison*, 270 S.W.3d 21, 29 (Tenn. 2008), the Defendant was in the position of a "person to whom a subpoena is directed" and who is subject to the seven-day limitation.

Whether the Defendant was subject to the seven-day limitations period is a question of statutory construction, which this court reviews de novo.  *Wlodarz v. State*, 361 S.W.3d 490, 496 (Tenn. 2012), *abrogated on other grounds by Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016).  This court must examine the plain language of the statute

to determine the legislature's intent. *State v. Jennings*, 130 S.W.3d 43, 46 (Tenn. 2004). When the language of the statute is clear and unambiguous, we apply "the statute's plain language in its normal and accepted use." *Keen v. State*, 398 S.W.3d 594, 610 (Tenn. 2012).

In *Harrison*, our supreme court held that "[a] person has standing to challenge a subpoena issued to a third party, as long as that person asserts a personal right, privilege, or proprietary interest in the materials being sought by the subpoena." 270 S.W.3d at 29. The court concluded that a criminal defendant had standing to challenge a subpoena for his mental health records from a clinical psychologist who treated him on the basis that the prosecutor who sought the subpoena was not authorized to do so and the subpoena sought information to which the State was not entitled. *Id.* at 28-29. The court did not base its decision upon the language in section 40-17-123, as the defendant was neither a custodian of the records nor was he seeking to challenge the subpoena based upon the unreasonableness or oppressiveness of complying with the subpoena. *See id.* The court recognized that while section 40-17-123(k) allows custodians of records to challenge a judicial subpoena, "it does not purport to prevent or to restrict the right of other persons with a demonstrable legal interest in the subpoenaed records to challenge the subpoena on grounds other than the unreasonableness or oppressiveness of complying with the subpoena." *Id.* at 28. Instead, the court based its holding regarding a third person's standing to challenge a subpoena on common law. *Id.* at 28-29.

In holding that the defendant in *Harrison* had standing to challenge the subpoena, the court did not expressly place the defendant in the position of a "person to whom a subpoena is directed" and whose challenges are subject to the seven-day limitation. Instead, the court determined that the defendant's rights fell outside of the statute. *Id.* The plain language of section 40-17-123(k) requires that the "person to whom a subpoena is directed" challenge the subpoena within seven days of service. The Defendant's cell phone carrier, and not the Defendant, was the "person to whom a subpoena [was] directed." Furthermore, the Defendant could not have challenged the subpoena within seven days of its service because he was not given notice of its issuance and section 40-17-123 does not require that "the target of a subpoena issued to a third party be notified about the issuance of the subpoena." *State v. Nathaniel P. Carson*, No. M2010-02419-CCA-R3-CD, 2012 WL 1484188, at *16 (Tenn. Crim. App. Apr. 27, 2012). We recognize that this court previously held that a defendant waived his challenges to a subpoena by failing to file a timely motion to quash. *See State v. Bruce D. Mendenhall*, No. M2010-01381-CCA-R3-CD, 2013 WL 360525, at *55 (Tenn. Crim. App. Jan. 30, 2013). However, neither section 40-17-123 nor *Harrison* sets a time limit in which a criminal defendant may challenge a subpoena issued to a third party. Accordingly, we cannot conclude that the Defendant's motion, filed more than two years prior to trial, was untimely.

The Defendant maintains that the affidavit in support of the subpoena failed to state (1) the "articulable reasons" why the officer believed that the cell phone records would materially assist in the investigation into Mr. Ike's murder and (2) the nexus between the cell phone records and Mr. Ike's murder. *See* T.C.A. § 40-17-123(c)(2), (5). The Defendant asserts that the affidavit did not include any information as to how he was identified as a suspect, why the officer believed the Defendant's cell phone had evidentiary value, or why obtaining the cell phone records, as opposed to other investigative techniques, would be effective. The Defendant further asserts that the affidavit does not indicate that he was speaking to others about the offense, that he was using his cell phone to plan the murder, or that the officers had any reason to pursue him as a suspect.

Section 40-17-123 does not require that the affidavit meet the heightened standard of probable cause necessary for the issuance of a search warrant. The statute only requires that the affiant present the court with information establishing a "reasonable basis" to believe that production of the documents will materially assist in the investigation of the offense and that a clear and logical nexus exists between the requested documents and the offense. *See* T.C.A. § 40-17-123(d)(1)(B), (C); *Nathaniel P. Carson*, 2012 WL 1484188, at *15. For example, in *State v. Nathaniel P. Carson*, this court concluded that the affidavit established a nexus between the documents requested and the offense committed when the affidavit provided that the victims had been shot and killed, that several suspects had been developed, that four suspects had been arrested, that detectives believed more suspects were involved based on interviews with the arrestees, that the suspects communicated over the telephone, and that the telephone records were needed to assist in the identification and eventual apprehension of the suspects. 2012 WL 1484188, at *13-15. This court concluded that "[i]t was reasonable to believe the suspects would have placed telephone calls to other potential suspects before and after the shootings." *Id.* at *15.

We likewise conclude that the information in the affidavit met the minimal standards necessary for the issuance of a subpoena of the Defendant's cell phone records. The affidavit provided that the Defendant was a suspect in Mr. Ike's murder, that evidence indicated that the Defendant had planned the murder in advance, and that the records were needed to gain additional information relating to the Defendant's involvement in the murder. It was reasonable to believe that the Defendant would have utilized his cell phone in planning the murder. While the information included in the affidavit was sparse, we conclude that the affidavit was sufficient and that the trial court did not err in denying the Defendant's motion.

## B. Application of *Carpenter*

After the Defendant filed his initial brief, the United States Supreme Court released its opinion in *Carpenter v. United States*, 138 S.Ct. 2206, 2217, 2221 (2018), in which the Court held that an individual maintains a legitimate expectation of privacy under the Fourth Amendment in records of his or her physical movements as captured through historical cell-site location information and that the government, generally, must obtain a search warrant supported by probable cause before acquiring such information from a wireless carrier. In his reply brief, the Defendant contends that the officer's acquisition of the Defendant's cell phone records through a subpoena was unconstitutional under *Carpenter*. During oral argument before this court, the State relied upon the good faith doctrine.

Appellate courts must apply new constitutional rules retroactively to cases pending on direct review when the new rule was announced. *Griffith v. Kentucky*, 479 U.S. 314, 326-28 (1987); *State v. Minor*, 546 S.W.3d 59, 68 (Tenn. 2018). Accordingly, the ruling in *Carpenter* applies to all cases pending on direct review when it was decided. However, this court's application of *Carpenter*, is "subject to existing jurisdictional principles, such as appellate review preservation requirements and the plain error doctrine." *Minor*, 546 S.W.3d at 70.

The Defendant filed a motion to suppress prior to trial, challenging the sufficiency of the affidavit in support of the request for a subpoena to obtain his cell phone records. While he referenced the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution in his motion, his argument focused upon whether the requirements of Tennessee Code Annotated section 40-17-123 were met. He did not challenge in the trial court the constitutionality of the officer's obtaining the cell phone records without a search warrant and, thus, waived plenary appellate review of the issue. *See* Tenn. R. Crim. P. 12(f) ("[A] party waives any defense, objection, or request by failing to comply with … rules requiring such matters to be raised pretrial…"); Tenn. R. Crim. P. 12(b) (requiring motion to suppress be raised pretrial); *see also* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party … who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Because the Defendant failed to comply with appellate review preservations requirements, we "must utilize the plain error doctrine rather than plenary appellate review when applying a new rule." *Minor*, 546 S.W.3d at 70.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R.

App. P. 36(b). Five factors must be met before this court will conclude that plain error exists:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)). All five factors must be established before this court will recognize plain error and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

The subpoena in the present case yielded the Defendant's call history and the historical cell site location information. *Carpenter*, however, is limited to historical cell site location information and does not preclude the admission of other information in the Defendant's cell phone records. *See Carpenter*, 138 S.Ct. at 2220. Accordingly, the Defendant has failed to establish that the admission of his call history obtained from his cell phone records breached a clear and unequivocal rule of law.

We need not consider whether the admission of historical cell site location information breached a clear and unequivocal rule of law or whether a good faith exception applies because we conclude that a substantial right of the Defendant was not adversely affected. To establish that an error affected a defendant's substantial rights, the defendant must "'show a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Martin*, 505 S.W.3d at 505 (quoting *Molina-Martinez v. United* States, 136 S.Ct. 1338, 1343 (2016)). "Where the defendant seeks plain error review, it is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.*

Evidence of the Defendant's cell site location information did not relate to his convictions for theft, failure to appear, or the firearm offenses. Thus, the admission of the evidence was harmless beyond a reasonable doubt with regard to these convictions. The State used the Defendant's cell site location information to corroborate Mr. Beverly's testimony at trial. However, Mr. Beverly's testimony was strong and was

corroborated by a substantial amount of other evidence, including physical evidence, video surveillance, and the testimony of other witnesses such as Mr. Wilson and Mr. Colley. Accordingly, we conclude that the Defendant has failed to establish a reasonable probability that, but for the admission of his cell site location information, he would not have been convicted of especially aggravated kidnapping, especially aggravated robbery, and attempted first degree murder.

With regard to the Defendant's first degree murder conviction, his cell site location information showed that the Defendant's cell phone utilized a cell tower that encompassed the area of the shooting around the time of the shooting. However, such evidence was of limited value as Detective High testified that he could not determine the exact location of the Defendant's cell phone based on the call detail records and that cell towers in urban areas cover a range of one to five miles. Detective High could not definitively state that the cell tower utilized by the cell phone was the closest tower to the cell phone.

While there were no witnesses who identified the Defendant as the shooter or as being present when the shooting occurred, the State also proceeded on a theory of criminal responsibility, which did not require that the Defendant be the shooter or even be present when the shooting occurred. *See State v. Joshua Hunter Bargery*, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *72 (Tenn. Crim. App. Oct. 6, 2017) ("[T]here is no requirement under the law that someone criminally responsible for the actions of another be present when and where the crime occurs."). Rather, the State was required to show that the Defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, … solicit[ed], direct[ed], aid[ed], or attempt[ed] to aid another person to commit the offense." T.C.A. § 39-11-402(2).

The evidence presented at trial, albeit circumstantial, was sufficient to establish the Defendant's guilt under a theory of criminal responsibility. The Defendant had been searching for Mr. Ike in the days leading up to the shooting and implored others to assist him in locating Mr. Ike. The Defendant expressed via text message his intention to remove his ankle monitoring devise and "get da thuggn." He removed his ankle monitoring device and did not return to his home in an effort to avoid detection. Two days before the shooting, he obtained Mr. Hall's cell phone number from Mr. March, contacted Mr. Hall, and provided Mr. Hall with Mr. Ike's cell phone number. On the afternoon of the shooting, the Defendant and Mr. Hall exchanged calls to each other at the same time period during which Mr. Hall and Mr. Ike were exchanging calls. At 6:12 p.m., Mr. Ike called Mr. Hall, during which time Mr. Ike's cell phone communicated with the cell tower that covered the area in which the shooting occurred. This was Mr. Ike's final outgoing call.

- 61 -

Ms. Cartwright saw a car that was later identified as belonging to Mr. Ike drive up to Mr. Hall's home and park on the street. Mr. Hall exited his home and entered the car on the passenger side. Ms. Cartwright then saw a man running down the street and toward Mr. Ike's car while holding a gun. She heard gunshots shortly thereafter and saw a silver SUV speeding away. Approximately eleven minutes after Mr. Ike made his last outgoing call, Mr. Hall sent the Defendant a text message, instructing him to "[t]hrow your phone," and the Defendant responded by calling Mr. Hall.

Mr. Ike was shot and killed with a black and silver Smith & Wesson .40 caliber semi-automatic pistol. The evidence indicated that the Defendant had possession of the pistol prior to and shortly after the shooting. A photograph of the Defendant holding a similar firearm was on his cell phone. One minute before Mr. Ike made his last call to Mr. Hall, the Defendant sent a text message to his wife in which he denied that he was with another woman and said he was with "his 40." The Defendant possessed the gun that was used to kill Mr. Ike and shoot Mr. Beverly in another area of town sometime between 6:30 p.m., when he last called Mr. Beverly, and 6:49 p.m., when calls began to be exchanged between Mr. Beverly's cell phone and Mr. Wilson's cell phone regarding the Defendant's demand for a ransom. The Defendant also boasted to Mr. Beverly about killing others on the same day.

Based upon the limited value of the Defendant's cell site location information and the evidence presented supporting the Defendant's guilt on the basis of criminal responsibility, we conclude that the Defendant has failed to show a reasonable probability that but for the admission of his cell site location information, he would not have been convicted of first degree murder. The Defendant has failed to meet his burden in establishing that the admission of the evidence adversely affected a substantial right and, thus, has failed to establish that he is entitled to relief based upon plain error. *See Smith*, 24 S.W.3d at 282.

### VI. Admission of Expert Testimony on Cell Tower Evidence

The Defendant contends that the trial court erred in admitting expert testimony regarding cell tower evidence because the reliability of such information as a location detection device was not established in accordance with Tennessee Rule of Evidence 702 and 703 and *McDaniel v. CSX Transportation*, *Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). The State responds that cell tower evidence need not be presented through expert testimony, that the trial court properly admitted the evidence, and that any error was harmless.

## A. Pretrial Hearings

Prior to trial and in response to the Defendant's request for notice of the State's expert witnesses, the State announced that it planned to call Detective High at trial to testify regarding the cell phone data and cell tower evidence obtained in the case. The State also announced that it potentially would call TBI Special Agent Michael Frizzell to testify regarding the general operation of cell towers. Mr. Hall filed a motion, which the Defendant adopted, seeking to exclude Detective High's testimony and to hold a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to determine the relevance and reliability of Detective High's testimony. The Defendant later filed a second motion seeking to exclude all expert and lay testimony on cell tower evidence as unreliable.

Detective High testified during multiple pretrial hearings regarding his experience, his analysis, and his conclusions. At the time of the first hearing, he had been with the Metropolitan Nashville Police Department for twelve years. In March 2015, he was assigned to the criminal investigations division within the surveillance and investigative support unit ("SISU"), which provided technical investigative support, including cell phone and video forensic examinations. Prior to being assigned to the SISU, Detective High was a homicide detective who obtained multiple court orders for cell phone records. As a result, he developed an interest in and specialized knowledge of cell phones, which led to his assignment to the SISU. Detective High had worked in conjunction with and received training from the TBI unit that analyzes cell phone data records. Approximately one month prior to the hearing, Detective High completed a sixteen-hour course on the analysis of call detail records presented by the National White Collar Center. He also completed a twenty-four-hour advanced course in North Carolina.

Detective High reviewed the call detail records related to the case, as well as the reports of information extracted from the various cell phones. He utilized a computer program and prepared a PowerPoint presentation utilizing the call detail records and cell tower information. He offered testimony regarding his findings that was consistent with his testimony at trial.

On cross-examination, Detective High testified that he began examining the information in this case shortly after he was assigned to the SISU. He manually plotted the information regarding the cell tower locations utilizing Google Maps. In July 2015, the unit began using a computer program called GeoTime to analyze cell data information. Detective High imported the data into the program, validated the information, and obtained the same result that he had obtained when he manually analyzed the reports.

Detective High testified that this was the first case on which he had been the primary forensic analyst. Prior to performing the work on this case, his training had consisted of consultations with the TBI and his work in performing a call detail records analysis on the cases in which he was assigned as a homicide detective. Detective High had since received training on plotting cell phone locations manually. He had testified in one other case involving his manual forensic analysis.

Detective High testified that Sprint is a code division multiple access network, which generally has its cell phones, or "handsets," communicate with the most efficient tower. He explained that the majority of the time, the most efficient tower is the tower closest to the handset because the tower has the strongest signal. He acknowledged that the most efficient tower is not always the closest tower. He stated that call volume and the time of day, such as rush hour, are factors that determine whether a cell phone may or may not use, or "ping off" the closest tower. He explained that if the closest cell tower is taking in a large number of calls, the network will switch to another tower with a stronger signal. He stated that visibility can also affect the tower to which a cell phone "pings." He explained that if a building or mountain obstructs the view and weakens the signal to the closest tower, the cell phone might ping to another tower that is further away but more efficient. Detective High was unable to determine whether the tower pinged was the closest tower to the handset. He stated that even if a call is rerouted to another tower, the tower is generally within close proximity to the handset even if it is not the closest tower. He agreed that only the approximate location of the handsets could be determined based on the data.

The State recalled Detective High during a hearing in February 2016, and he offered additional details regarding his training and experience. He testified consistently with his prior testimony and his testimony at trial. He agreed that carriers collect the data in call detail records primarily for billing purposes and that the records are not created for the purpose of litigation or criminal prosecutions. He stated that such records are tools commonly used in law enforcement.

On cross-examination, Detective High reiterated his prior testimony regarding the usage of the cell tower with the strongest signal, which is not always the cell tower that is closest to the handset. He agreed that there was no way of determining from the call detail records which cell tower had the best quality signal or how often a handset communicates with the closest tower. He agreed that there was no uniform governmental standard for the use of historical call detail records.

Although Detective High listed a radius of one and one-half miles within each cell tower in his Powerpoint presentation, he explained that the illustration merely represented the sector of each cell tower with which the handset was communicating. He stated that

the range in which the cell tower covered could have been greater or less than one and one-half miles and that he could not determine from the call detail records the range in which a cell tower covers at a specific time.

During a separate hearing, the State presented the testimony of TBI Special Agent Michael Frizzell, whose duties included the examination of call detail records. Special Agent Frizzell detailed his training in the area and the courses that he had completed and stated that he had been accepted as an expert in the field of law enforcement use of telecommunications on four or five occasions.

Special Agent Frizzell explained that call detail records can be used to determine basic subscriber information and incoming and outgoing calls. He stated that law enforcement officials also use cell tower information to obtain a general idea of the large geographical area where a handset may have been during a particular point in time and to corroborate other information obtained during an investigation. He said that when a handset is being used, it is looking for the best quality signal, which is generally from the closest cell tower. He stated that the cell tower with the best signal is not always the closest tower and that environmental conditions and obstructions factor into which cell tower has the best signal.

On cross-examination, Special Agent Frizzell testified that the exact location of a handset cannot be determined from call detail records. He agreed that there was no way to determine from the call detail records whether the cell tower pinged was the closest tower to the handset. He also agreed that a handset could ping to the next tower or a tower further away and that it was impossible to determine how often a handset skips to another tower based on the call detail records. He acknowledged that cell towers vary widely in the strength and size of the coverage area. The call detail records did not provide the area of coverage for each cell tower, the power output of the antenna, the intensity of the call volume at a particular time, or any obstructions that may affect the signal. He stated that rush hour traffic may increase call volume for a specific cell tower but that such an effect is not reflected in call detail records.

Special Agent Frizzell testified that tracking someone through the use of call detail records is the least accurate method for utilizing call historical data. He did not rely on call detail records to place a person in a particular location. He believed that networks maintained historical call data for business purposes and not for law enforcement purposes. He did not believe there was an industry standard for the use of call detail records by law enforcement but said that based upon his conversations with law enforcement officials throughout the county, they are using the information for the same purposes. He did not know the rate of error in tracking handsets using the data.

On redirect examination, Special Agent Frizzell testified that examining a series of cell tower communications can be more useful than examining one isolated communication from one cell tower because a pattern can be determined. He stated that such information could be used to corroborate other evidence in the case.

The trial court issued an order denying the Defendant's motion to exclude the testimony. The trial court found that both Detective High and Special Agent Frizzell were qualified to testify as experts in the fields of law enforcement's use of call detail records and of call detail record analysis. The trial court stated that Detective High's opinion regarding the location and placement of each cell tower sector to which the various handsets were connected was based upon appropriate facts and data and upon reliable methodology. The trial court found that factors such as obstacles, physical traffic, and cellular traffic affecting cell signal strength were relevant to the weight of the expert's testimony and were the proper subject of cross-examination but that the factors did not render the methodology of call detail records analysis unreliable. The trial court further found that the specialized knowledge of the experts would substantially assist the jury in understanding the call detail records and that absent such testimony, the jury would be unable to understand the records, which are highly probative to the case. The trial court concluded that as a result of its finding that the analysis of call detail records was reliable, the consideration of the non-exclusive factors in *McDaniel* were unnecessary. The trial court noted that the use of call detail records to determine the general location of a cell phone had been widely accepted by numerous federal courts and Tennessee state courts.

## B. Analysis

Generally, questions relating to the qualifications, admissibility, relevancy, and competency of expert testimony are matters left to the trial court's discretion. *McDaniel*, 955 S.W.2d at 263. This court may not overturn a trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion. *Id.* at 263-64. A trial court abuses its discretion when the court applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002).

The admissibility of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence…. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

The State only presented Detective High to testify as an expert at trial. On appeal, the State asserts for the first time that Detective High's testimony need not meet the standards for reliability required for expert testimony because Detective High's testimony was lay testimony rather than expert testimony. However, it was the State that sought to qualify Detective High as an expert for purposes of trial and to have his testimony presented as expert testimony. The trial court instructed the jury that "Detective High will be allowed to give his expert opinion in that field and give his testimony such weight as you choose." The trial court also instructed the jury following closing argument regarding the jury's consideration of expert testimony and listed Detective High as an expert in call detail analysis. After the State sought to present Detective High's testimony as expert testimony and the trial court instructed the jury in accordance with the State's claim, the State cannot now argue for the first time on appeal that Detective High's testimony was lay testimony rather than expert testimony. *See Adkisson*, 899 S.W.2d at 635-36 (observing that "a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this Court") (quotations omitted).

Regardless, we conclude that Detective High's testimony at trial constituted expert testimony. "'The distinction between an expert and a non-expert witness is that a non-expert witness's testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field.'" *State v. Walter Williams*, No. W2009-02438-CCA-R3-CD, 2011 WL 2306246, at \*4 (Tenn. Crim. App. June 7, 2011) (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)). This court has recognized that a layperson could plot cell sites listed in a defendant's cell phone records on a map and draw an inference that the defendant traveled near the cell towers and that, as a result, such testimony does not require the specialized knowledge contemplated by Tennessee Rule of Evidence 702. *See e.g., State v. Johnny Lorenzo Wade*, No. W2017-00933-CCA-R3-CD, 2018 WL 3414471, at \*11 (Tenn. Crim. App. July 13, 2018), *perm. app. denied* (Tenn. Nov. 15, 2018); *State v. Dominique Greer*, No. E2015-00922-CCA-R3-CD, 2017 WL 2233647, at \*16 (Tenn. Crim. App. May 17, 2017); *State v. Clarence D. Hayes*, No. M2008-02689-CCA-R3-CD, 2010 WL 5344882, at \*10 (Tenn. Crim. App. Dec. 23, 2010). However, each of these cases involved the testimony of a lay witness, and the State never sought to

qualify the witness as an expert. *See Johnny Lorenzo Wade*, 2018 WL 3414471, at *11; *Dominique Greer*, 2017 WL 2233647, at *16; *Clarence D. Hayes*, 2010 WL 5344882, at *10.

By qualifying Detective High as an expert witness, the State was allowed to present testimony that Detective High's conclusions were not only based upon a simple review of the call detail records but also upon his specialized training and experience. Detective High also testified at trial regarding the operation of cell phones and cell towers, the range of cell towers, factors that affect cell signals, and the value of analyzing call detail records in criminal investigations, all of which constitute specialized knowledge that must be presented through an expert witness. *See e.g., United States v. Natal*, 849 F.3d 530, 536 (2d Cir. 2017); *United States v. Hill*, 818 F.3d 289, 296 (7th Cir. 2016); *United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011); *State v. Carillo*, 399 P.3d 367, 376-77 (N.M. 2017); *Collins v. State*, 172 So.3d 724, 741 (Miss. 2015).

The Defendant argues that Detective High's testimony was unreliable and, therefore, should have been excluded by the trial court. Our supreme court has recognized two aspects of foundational reliability: "(1) reliability of the field itself and (2) the trustworthiness of the facts or data utilized by the expert." *State v. Scott*, 275 S.W.3d 395, 407 (Tenn. 2009). The Defendant challenges both aspects of foundational reliability based upon testimony that handsets do not always utilize the closest cell tower, that there are several factors that determine whether the closest cell tower has the strongest signal, and that Detective High could not determine from the records whether the cell towers utilized by the handsets were the cell towers that were closest to the handsets.

In *McDaniel v. CSX Transportation, Inc.*, our supreme court listed "nonexclusive factors" that courts "could" consider in evaluating the reliability of scientific testimony, including:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether … the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel*, 955 S.W.2d at 265. These factors also may be applied to nonscientific expert testimony. *See Stevens*, 78 S.W.3d at 834. Other nondefinitive factors that a trial court may consider in assessing the reliability of an expert's methodology include the expert's

qualifications and the connection between the expert's knowledge and the basis of the expert's opinion. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 274-75 (Tenn. 2005); *Stevens*, 78 S.W.3d at 835. The expert's qualifications are relevant "particularly where the expert's personal experience is essential to the methodology or analysis underlying his or her opinion." *Brown*, 181 S.W.3d at 274. Our supreme court has cautioned trial courts against using this factor as the sole basis of reliability, as such a finding would result in the expert testimony becoming "perilously close to being admissible based upon the ipse dixit of the expert." *Id.* (quotation omitted). The purpose of considering the connection between the expert's knowledge and the basis for the expert's opinion "is to ensure that an 'analytical gap' does not exist between the data relied upon and the opinion offered." *Id.* at 275. This factor is of particular importance "when the expert's opinions are based upon experience or observations as these areas are not easily verifiable." *Id.*

In challenging the reliability of Detective High's testimony, the Defendant relies upon *United States v. Evans*, 892 F. Supp. 2d 949, 956 (N.D. Ill. 2012), in which the district court concluded that an FBI special agent's testimony in which he relied upon the "granulization" theory to opine that calls placed from the defendant's cell phone could have come from the building where the victim was held for ransom was not reliable. This "granulization" theory required that the agent: (1) identify the physical location of the cell towers used by the cell phone, the specific antenna used at each cell site, and the direction of the antenna's coverage; (2) estimate the range of each antenna's coverage based on the proximity of the cell tower to other cell towers in the area; and (3) use his training and experience to predict where the coverage areas of the cell towers overlapped. *Id.* at 952. Detective High, however, did not utilize the "granulization" theory in conducting his analysis. Furthermore, while we acknowledge that acceptance within the field of expertise, not judicial acceptance, is relevant in assessing expert testimony, we note that reliability of historical cell-site analysis similar to that conduct by Detective High has been recognized by other jurisdictions. *See e.g., Hill*, 818 F.3d at 298 (7th Cir. 2016); *Holbrook v. Commonwealth*, 525 S.W.3d 73, 82 (Ky. 2017); *State v. Abrams*, 161 A.3d 1182, 1196-97 (R.I. 2017); *State v. White*, 37 N.E.3d 1271, 1280-81 (Ohio Ct. App. 2015). Thus, we decline to apply the holding in *Evans* to the facts of this case.

The Defendant challenges the trial court's failure to consider the factors set forth in *McDaniel* in finding that Detective High's testimony was reliable. However, our supreme court has recognized that the factors are "non-exclusive" and that "a trial court need not consider all of these factors in making a reliability determination." *Brown*, 181 S.W.3d at 275. "[T]he trial court enjoys the same latitude in determining how to test the reliability of an expert as the trial court possesses in deciding whether the expert's relevant testimony is reliable." *Id.* "The objective of the trial court's gatekeeping function is to ensure that 'an expert, whether basing testimony upon professional studies

or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Detective High's expert testimony regarding the use of cell site location information was not novel, and he testified that such information is used regularly by law enforcement. National organizations provide seminars training officers in the use of this information. Detective High received extensive training in the area and had utilized the information in his criminal investigations as both a homicide detective and as a member of a specialized unit that provides technical support to other officers.

Moreover, Detective High was forthcoming with what an analysis of the call detail records could and could not establish. He readily acknowledged that he could not determine the exact location of the headsets and that cell site location information is only used as corroborative, not primary, evidence. Detective High's testimony clearly indicated "the level of precision—or imprecision—with which that particular evidence pinpoints a person's location at a given time." *Hill*, 818 F.3d at 299 ("The admission of historical cell-site evidence that overpromises on the technique's precision—or fails to account adequately for its potential flaws—may well be an abuse of discretion.").

The Defendant contends that Detective High's testimony should have been excluded because the State argued during closing arguments that the historical cell-site location information could be considered in determining the location of a call. Any misstatement of evidence by a prosecutor during closing arguments does not lead to the exclusion of such evidence at trial but leads to a claim of prosecutorial misconduct. *See State v. Sexton*, 368 S.W.3d 371, 419 (Tenn. 2012) (recognizing a prosecutor's intentionally misstating the evidence or misleading the jury as to the inferences it may draw as an area of potential prosecutorial misconduct related to closing arguments). The Defendant did not raise any objections to the prosecutor's closing arguments on this basis at trial and does not raise a claim of prosecutorial misconduct on appeal. The Defendant cites to the following examples of comments made by the prosecutor during closing arguments: (1) The Defendant "is the one with that phone that's hitting the tower that covers Felicia and 33rd exactly where Chijoke Ike was murdered"; (2) "[R]ecords show Timothy Brown goes up to Sunnyview exactly where Alan Beverly goes to meet him"; (3) "I mean, if Keandre March is some master[]mind, I mean, first of all, his cell phone movement and Timothy Brown's cell phone movement are not coinciding. They are both eventually heading to the same place, but they are traveling, if you look at that, they are traveling at a different pace"; and (4) The Defendant "drove over and he parked on Felicia, most likely with Mr. March and they waited. Because remember, he's at that cell tower for a couple of minutes and he's communicating with his wife." We conclude that these statements are proper inferences from all of the evidence presented at trial.

Furthermore, the prosecutor acknowledged the limited value of historical cell-site location information during the rebuttal closing argument.

"The party proffering expert testimony need not establish that the expert testimony is correct, only that the expert testimony, 'rests upon good grounds.'" *State v. Brian C. Frelix*, No. M2017-00388-CCA-R3-CD, 2018 WL 2722796, at *21 (Tenn. Crim. App. June 6, 2018) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)), *perm. app. denied* (Tenn. Sept. 13, 2018). When such a foundation has been established, "the proffered expert testimony 'should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.'" *Id.* (quoting *Ruiz-Troche*, 161 F.3d at 85). The defense thoroughly cross-examined Detective High regarding the records, factors that determine the cell tower with the strongest signal, and other limitations regarding the use of historical cell-site location data. We conclude that the trial court did not abuse its discretion in admitting the testimony.

## VII. Denial of Motions to Suppress Evidence Obtained From Search of the Defendant's Cell Phone

The Defendant challenges the trial court's denial of his motions to suppress evidence obtained from his cell phone. He contends that the officer's opening the back of the cell phone to obtain the serial number constitutes an illegal search. He also contends that the affidavit in support of the search warrant for his cell phone failed to establish a nexus between the cell phone and the offense being investigated or a nexus between the cell phone and the Defendant. The State responds that the officer's obtaining the cell phone's serial number did not constitute a search, that the serial number was obtained during a lawful inventory search, and that the search warrant included a sufficient nexus between the cell phone and the criminal activity.

### A. Pretrial Proceedings

Prior to trial, the Defendant filed a motion to suppress evidence obtained from his cell phone as a result of a search warrant and maintained that the affidavit in support of the search warrant was insufficient to establish probable cause. He attached the search warrant and the supporting affidavit to the motion. The search warrant was issued and executed on August 13, 2012, for a "Sprint HTC cellular phone bearing serial number HT18VHX02825 MR001-00 C" in relation for an investigation of especially aggravated kidnapping. The evidence to be search included any text messages, images, multimedia files, call history, any deleted content, or any other digital file related to the incident. Detective Hanson, the affiant, provided that the cell phone was located at SISU.

The affidavit in support of the search warrant provided as follows:

On 8/9/12[,] Police responded to 1577 N. Gallatin Pike regarding a shooting. When police arrived[,] they found a silver Chevrolet Malibu … and two victims. The victims at the scene were identified as Keandre March and Alan Beverly. Keandre March was transported to Skyline Hospital where he was later pronounced deceased. Alan Beverly was transported to Vanderbilt Hospital where he was treated for multiple gunshot wounds. Responding detectives found shell casings and blood in and around the silver Chevrolet Malibu. Witnesses also reported hearing gunshots and seeing the silver Chevrolet Malibu veer off the road and crash[]. Then they heard more gunshots and saw muzzle flashes and a short time later saw a black male with a light colored t-shirt running towards the nearby Home Depot. This man was later identified as Timothy Brown. Witnesses also saw Alan Beverly exit the car and ask for assistance.

Detectives spoke to Alan Beverly at Vanderbilt Hospital. He stated that he had been on Kings Lane when two black males forced him back into his car at gunpoint. They began demanding money from him[,] and he agreed to call his brother, Michael Wilson, to try to get some money. He stated that he lost contact with his brother and Timothy Brown then called him on his own cell phone (the Spring HTC cellular phone bearing serial number HT18VHX02825 MR001-00 C). The two black males then drove Alan to Madison in his car, still holding him at gunpoint. Alan stated that he was in the back seat of the car with one of the men while the other one drove. Alan tried to grab the gun from the man in the back seat[,] and the gun went off, striking the man driving the car. He then tried to grab the gun again and wrestled it away as the suspect pulled out a second gun. Alan and the other man then began shooting at each other.

K9 officers also responded to the scene where the car crashed and they were able to track Timothy Brown hiding in a dumpster near a strip mall. Timothy had a gunshot wound and was transported to Vanderbilt Hospital where he was interviewed by detectives. Timothy stated that he had gone to Kings Lane with his cousin Keandre March to sell some marijuana to a man named "Slug." When they arrived "Slug" pulled out two guns and ordered Timothy into the driver's seat of his car and Keandre into the front passenger seat. "Slug" then got into the back seat and ordered Timothy to drive around, keeping them at gunpoint. While they were driving around Keandre attempted to grab the guns from "Slug[,]" and "Slug" began firing

the guns. Once the car came to a stop[,] Timothy got out of the car and began running until he was apprehended by officers.

Detectives spoke with Michael Wilson at the Madison Precinct. He stated he had received a phone call from his brother, Alan Beverly, who advised he was being held again[st] his will and the subjects that were holding him were demanding money. He stated he had a bad phone connection and lost contact with his brother. He stated he received … another call from a private number, and an unknown male subject told him that they would harm his brother if he didn't get them $30,000.

Based on the statements of witnesses, the statements of Timothy Brown and Alan Beverly, Michael Wilson and the evidence at the scene, it is believed that Alan Beverly, Timothy Brown, and Keandre March were in a silver Chevrolet Malibu … and Alan Beverly was being held against his will. While they were in the vehicle there was a struggle over two guns. During that struggle all three men in the car were shot and Keandre March later died as a result of his wounds. It is also believed that the Sprint HTC cellular phone bearing serial number HT18VHX02825 MR001-00 C will contain evidence that corroborates Alan Beverly and Michael Brown's [sic] statements.

….

Your Affiant is a Metropolitan Nashville Police Officer and has been for approximately 10 years. Your Affiant has been a Detective since June of 2006 and has worked both personal and property crimes in that capacity. Your Affiant has also assisted other Detectives with homicide, and robbery, investigations and has experience as a lead Detective on homicide and robbery cases. Your Affiant has experience executing search warrants and has recovered evidence that has been instrumental in the successful prosecution of criminal cases.

Following a hearing during which both parties offered argument, the trial court entered an order denying the Defendant's motion. The trial court found that the affidavit included a sufficient nexus between the criminal activity and the cell phone. The trial court further found the affidavit established probable cause to believe that evidence of the offense would be on the Defendant's cell phone and that the Defendant's cell phone was used in the perpetration of the offense. The trial court rejected the Defendant's claim that the failure to include information in the affidavit about how or when the cell phone came to be at the police station renders the search unconstitutional. The trial court found that

chain of custody is not required to establish probable cause and that based upon the date of the offense of August 9 and the date in which the search warrant was signed on August 13, the magistrate was able to determine that the information on the cell phone would have been current and not stale.

The Defendant also filed a motion to suppress evidence in which he maintained that his cell phone found on his person when arrested was unlawfully searched. He maintained that the officer's actions in obtaining the cell phone's serial number constituted an illegal search and that the serial number was used to identify the cell phone in a search warrant that was later obtained for the cell phone.

During a pretrial hearing, Detective Hanson testified that he was involved with the collection of a cell phone related to Mr. Beverly's case. He said he was trained to disable a cell phone by removing its battery before he submitted the cell phone to the property room. He did not know the reason for removing the battery but believed that the procedure was followed for the cell phone related to the case.

On cross-examination, Detective Hanson testified that when he first saw the cell phone, it was in a paper bag in the property room, and he did not know whether the battery had been removed from the cell phone. He obtained a search warrant for the Defendant's cell phone, and the search warrant included the serial number for the cell phone. He said he generally obtained a cell phone's serial number by removing the battery from the back of the cell phone. He stated that to his knowledge, no officer accessed information in the cell phone from the time that the cell phone was obtained on August 9, 2012, until the issuance of the search warrant on August 13. After obtaining the search warrant, Detective Hanson retrieved the cell phone from the property room and took it to SISU.

In its written order denying the Defendant's motion, the trial court found that the removal of the battery and the viewing of the serial number did not constitute a search and was an inventory procedure to log the cell phone in at the property room. The trial court stated that the contents of the cell phone were not searched until after a valid search warrant was obtained. The trial court found that the privacy concerns addressed in *Riley v. California*, 573 U.S. 373 (2014), regarding digital data and other information within a cell phone were not present in this case. The trial court found that the removal of the battery from the cell phone pursuant to standard police procedure was to prevent the contents of the cell phone from being erased remotely.

## B. Analysis

The Defendant contends that the officer's obtaining the serial number of the cell phone after the battery was removed was an illegal search. The State responds that the obtaining of the serial number did not constitute a search and that if a search occurred, it was a constitutional inventory search. Both parties rely upon *Riley v. California*, a United States Supreme Court opinion that was decided prior to the Defendant's trial but almost two years after the alleged search. 573 U.S. 373 (2014). In *Riley*, the Court held that officers are permitted to seize and secure an arrestee's cell phone to prevent the destruction of evidence but that officers are required to obtain a warrant to search the contents of a cell phone. *Id.* at 388, 401. The Court's decision in *Riley* related to data stored in a cell phone, while the alleged search in this case was of a serial number that was obtained once the cell phone's battery was removed. The Court in *Riley* specifically authorized the removal of a cell phone's battery to prevent the data stored in the cell phone from being erased remotely. *See id.* at 390.

However, we need not decide whether removing the battery and obtaining the serial number constituted an unreasonable search. The only information obtained as a result of removing the battery was the serial number, and the data and other incriminating information stored on the Defendant's cell phone was obtained during the execution of the search warrant. While the serial number was included in the affidavit in support of the search warrant, the Defendant does not contend on appeal that the inclusion of the serial number rendered the search warrant invalid. *See State v. Carter*, 160 S.W.3d 526, 532 (Tenn. 2005) (recognizing that while the exclusionary rule may bar the admission of evidence directly or indirectly obtained from an unconstitutional search or seizure, "the exclusionary rule does not apply to evidence obtaining by means independent of the constitutional violation").

Rather, the Defendant raises a separate issue on appeal challenging the sufficiency of the affidavit in support of the search warrant that is independent of any claim regarding the inclusion of the serial number of his cell phone in the affidavit. He maintains that the trial court erred in denying his separate motion to suppress evidence obtained during the execution of the search warrant because the affidavit in support of the search warrant for his cell phone failed to establish a nexus between the cell phone and the offense being investigated or a nexus between the cell phone and the Defendant.

The Fourth Amendment to the United States Constitution requires that search warrants issue "upon probable cause, supported by Oath or affirmation." Article I, section 7 of the Tennessee Constitution precludes the issuance of a warrant "without evidence of the fact committed, or [the seizure of] any person or persons not named, whose offences are not particularly described and supported by evidence." Thus, both

the federal and state constitutions require probable cause for the issuance of a warrant. *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998). Probable cause is defined as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *Id.* A finding of probable cause necessary for the issuance of a search warrant must be based upon evidence included in a written and sworn affidavit. *Id.*

To establish probable cause, the affidavit must demonstrate a "nexus among the criminal activity, the place to be searched, and the items to be seized." *State v. Saine*, 297 S.W.3d 199, 206 (Tenn. 2009) (citing *State v. Reid*, 91 S.W.3d 247, 273 (Tenn. 2002)). In determining whether the nexus has been sufficiently established, courts should consider "'whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] … the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence.'" *Id.* (quoting *Reid*, 91 S.W.3d at 275). If the affidavit does not include direct evidence of such a nexus, this court must determine "whether it was reasonable for the magistrate to infer that the items of contraband listed in [the] affidavit would be located" in the place to be searched. *Id.* "[U]nlike an affidavit in support of an arrest warrant, an affidavit seeking issuance of a search warrant need not implicate a particular person in the crime under investigation." *State v. Tuttle*, 515 S.W.3d 282, 301 (Tenn. 2017) (citations omitted).

"[O]nly the information contained within the four corners of the affidavit may be considered" in determining whether probable cause supported the issuance of the search warrant. *State v. Keith*, 978 S.W.2d 861, 870 (Tenn. 1998) (citations omitted). An issuing magistrate's finding of probable cause is entitled to great deference on appeal. *State v. Yeomans*, 10 S.W.3d 293, 296 (Tenn. Crim. App. 1999) (citing *State v. Melson*, 638 S.W.2d 342, 357 (Tenn. 1982)).

The affidavit in support of the search warrant was detailed and thorough. The affidavit identified the cell phone as belonging to the Defendant and stated that, according to Mr. Beverly, the Defendant utilized the cell phone to contact Mr. Wilson during Mr. Beverly's abduction. Mr. Wilson confirmed that after he received a call from Mr. Beverly reporting the abduction, Mr. Wilson received a call from a private number and spoke to an unknown male, who threatened to harm Mr. Beverly if Mr. Wilson did not pay $30,000. We conclude that the information in the affidavit established a nexus between the Defendant's cell phone and the criminal activity, as well as probable cause to believe that the Defendant's cell phone was used in the perpetration of the offense and that evidence of the offense would be on the cell phone. Accordingly, the trial court properly denied the Defendant's motion to suppress.

## VIII. Admission of Text Messages from the Defendant's Cell Phone

The Defendant challenges the admission of multiple text messages extracted from his cell phone, arguing that the text messages were irrelevant and unfairly prejudicial. The State responds that the trial court properly exercised its discretion in admitting the challenged text messages. We agree with the State.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of discretion. *Pylant*, 263 S.W.3d at 870.

The parties filed multiple pleadings prior to trial regarding the text messages that the State was seeking to admit and the Defendant's objections to their admission. Following the pretrial hearings on the issue, the trial court entered an order in which it addressed each text message to which the Defendant objected, made extensive findings, and allowed the State to present some text messages, while excluding others.

The Defendant argues that the trial court erred in admitting various text messages suggesting that he was searching for an unnamed person. He specifically challenges the following text message exchanges:

- A text messages exchange with an unknown person on July 27, 2012, beginning at 7:09 p.m., during which the Defendant sent outgoing text messages stating, "Can u c em," "Let me know soonz he get ready to come out I'm out here," "Dats Wats up text me soonz he get up tho," "Fina run some where dont let em leave," and "Can u get em to walk out wit chu I'm out here." The trial court found that the evidence was relevant to the issue of premeditation, as it suggests that the Defendant is possibly searching for Mr. Ike.

- A text message exchange on July 30, beginning at 8:42 p.m., during which the Defendant contacted a cell phone number that was one digit different from Mr. Ike's cell phone number. The trial court found that the evidence was relevant to show that the Defendant attempted to contact Mr. Ike.

- A text message to Mr. March on August 5, stating "Ima hit u up soonz I get word on something." The trial court found that the text message tended to show that the Defendant was contacting Mr. March and was searching for Mr. Ike near the date of the homicide. The Defendant sent the text message during an exchange with Mr. March during which the Defendant appeared to be searching for both Mr. Ike and Mr. Beverly.

- A text message from the Defendant to an unidentified person sent on August 6 stating, "U ain't seen dat n**** again today." The person responded "Nt wen I left." The trial court found that the text messages were relevant as circumstantial evidence that the Defendant was searching for Mr. Ike.

- A text message from the Defendant to an unidentified person sent on August 7 stating, "Tryna c is dis n**** home." The trial court found that the text message was relevant as circumstantial evidence that the Defendant was searching for Mr. Ike.

The relevancy of these text messages should be determined by viewing the context of the Defendant's text message exchanges in the weeks leading up to Mr. Ike's homicide as a whole, rather than viewing each individual text message in a vacuum as the Defendant appears to suggest. Other text messages sent by the Defendant show that he was searching for Mr. Ike in the weeks leading up to the homicide. In many of the text messages, the Defendant specifically referred to Mr. Ike by his nickname Goldie. Although the Defendant did not do so in the text messages that he challenges on appeal, we conclude that the trial court properly found that these text messages were relevant as evidence of the Defendant's search for Mr. Ike. The probative value of these text messages is not substantially outweighed by the danger of unfair prejudice. The trial court properly exercised its discretion in admitting the text messages.

The Defendant challenges the admission of text messages during an exchange on July 29 stating, "i can't leave da city I'm on house arrest" and "I gota c n at 9 out on bond." The trial court found that the admission of the evidence was addressed within its order admitting evidence pursuant to Tennessee Rule of Evidence 404(b). The trial court also found that the evidence was relevant to show a contextual history of how the Defendant became involved in the series of events and his subsequent intent to hide his location and actions. Because we have previously held that evidence of the Defendant's release on pending charges and the requirement that he wear a GPS monitoring device were properly admitted, we conclude that the trial court did not abuse its discretion in admitting the text message.

The Defendant also challenges the admission of a text message that he sent on July 31, 2012, in which he stated, "ima cut dis s*** off my legg n get da thuggn soon." He maintains that "n get da thuggn soon" should have been redacted. He contends that the phrase only served to portray him as living a criminal lifestyle and constitutes improper character evidence pursuant to Tennessee Rule of Evidence 404(a). The trial court admitted the text message as evidence of the Defendant's intent to commit the offenses. The Defendant sent the text message after an unidentified person contacted him about seeing Mr. Ike and provided Mr. Ike's location. The text message exchange occurred after the Defendant's 9:00 p.m. curfew, and the Defendant responded, "Aite I'm n tonight tho but ima cut dis s**t off my legg n get da tuggn soon keep me posted on that n**** Wen u c em cuz I got ya." This evidence does not constitute character evidence but is relevant as demonstrating the Defendant's intention to remove his GPS monitoring device and commit first degree premeditated murder, and the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 401, 403.

Finally, the Defendant challenges the admission of a text message that he sent to "O'Ball" during a text message exchange on August 7 stating, "Cuz might still c out but I really ain't tryna let key thang n on dis one just uz." The trial court determined that the text message was relevant as tending to show that the Defendant may have been the leader in the offenses. In the text message, the Defendant discusses not allowing Mr. March, whose nickname was "Ke-Thang," to participate in the offenses, and the evidence countered any claim by the Defendant that Mr. March was primarily responsible for the offenses. The trial court properly determined that the text message was relevant and not unfairly prejudicial.

## IX. Admission of Photographs from the Defendant's Cell Phone

The Defendant challenges the admission of photographs of himself extracted from his cell phone as irrelevant and unfairly prejudicial. The State responds that the trial court properly exercised its discretion in admitting the photographs. We agree with the State.

"Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." *State v. Morris*, 24 S.W.3d 788, 810 (Tenn. 2000). The admissibility of photographs is within the sound discretion of the trial court, and a trial court's decision to admit a photograph will not be overturned on appeal absent a clear showing that the trial court abused its discretion. *State v. Faulkner*, 154 S.W.3d 48, 67 (Tenn. 2005); *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). A photograph must be relevant to an issue in dispute. *State v. Vann*, 976 S.W.2d 93, 102-03 (Tenn. 1998) (citing *State v. Stephenson*, 878 S.W.2d 530, 542 (Tenn. 1994)); *Banks*, 564 S.W.2d at

951).  A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Tenn. R. Evid. 403.  The term "unfair prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Note).

The admission of photographs extracted from the Defendant's cell phone was addressed in multiple pleadings and pretrial hearings.  The Defendant argued that the photographs in the extraction report that were taken or sent to others through the cell phone in June and July of 2012 were not relevant to the issue of who was possessing and utilizing the cell phone around the time of the offenses.  The Defendant also objected to the admission of photographs depicting him possessing a large amount of cash, flashing gang signs, and holding a firearm as irrelevant and unfairly prejudicial.  He maintained that the firearm that he was holding in the photographs could not be confirmed to be the same firearm used in the commission of the offenses.

The prosecutor responded that the State was required to establish that the Defendant was the person who was utilizing the cell phone and sending text messages relating to the planning and commission of the offenses.  The prosecutor argued that in order to do so, the State must demonstrate the Defendant's pattern of usage of the cell phone.  The prosecutor noted that photographs of the Defendant, along with text message exchanges indicating that the person in the photograph was the sender, were being sent from the cell phone during the same time period in which the text messages relevant to the offenses were being sent.  The prosecutor asserted that as a result, the photographs were relevant as evidence that the Defendant was the person who was utilizing the cell phone during the applicable time period.  The prosecutor also asserted that photographs of the Defendant holding a firearm that was consistent with the firearm used in the commission of the offense was relevant to support evidence that the Defendant had possession of the murder weapon both before and after the murder.

The State acknowledged that the Defendant's arguments regarding the relevancy of the photographs could be stronger if the Defendant was willing to stipulate that he was in possession of his cell phone during the applicable time period and was the person who sent all of the communications from the cell phone.  Defense counsel responded that the defense did not contest the Defendant's ownership of the cell phone but that "[i]t's just a question of who would have had the phone at the time the texts were sent, if that's a different … question, I'm not sure."

The trial court entered an order finding that some photographs were admissible, while excluding other photographs as cumulative and unfairly prejudicial. The trial court noted that based on statements from defense counsel, the Defendant is asserting that the cell phone was not in his possession on the day of the offenses. The trial court found that photographs were sent from the cell phone over several months, thus showing a pattern of usage. The trial court stated that the photographs were highly relevant to show that the Defendant was in possession of the cell phone and was using the cell phone before and after the offenses, which tended to show that the Defendant was in possession of the cell phone on the day of the offenses. The trial court found that the photographs of the Defendant holding a silver and black firearm were relevant because the State alleged that a silver and black firearm was used in the commission of the offenses. The trial court also found that the probative value of the photographs was not outweighed by the danger of unfair prejudice.

Detective Holman testified at trial regarding a multimedia exhibit that included the photographs of the Defendant that had been sent from the Defendant's cell phone. According to his testimony and the exhibit, a photograph of the Defendant making a hand signal and wearing a baseball cap with a stack of cash underneath the cap was sent from the Defendant's cell phone to various numbers on July 29, August 8, and August 9. A photograph of the Defendant holding a large amount of cash was sent from his cell phone to various numbers on July 29 and August 8. A photograph of the Defendant making a hand signal was sent to various numbers on August 7 and August 8. Many of the photographs included the caption "Marley," which was the Defendant's nickname. On August 8, a photograph of the Defendant wearing a baseball cap backwards with the caption "Marley" was sent from the Defendant's cell phone.

Based upon the evidence presented at trial, the Defendant sent text messages searching for Mr. Ike as early as July 27 and continued to send text messages relevant to the planning and commission of Mr. Ike's murder up until the day of the offense. However, defense counsel indicated prior to trial that the identity of the person who had possession of the cell phone and was sending the text messages would be at issue at trial. To establish that the text messages were proof of premeditation and criminal responsibility, the State was required to establish that the Defendant was actually the person who was in possession of and utilizing the cell phone during this time period. Photographs of the Defendant sent from the cell phone during the same time period, many of which were sent during text message exchanges indicating that the person sending the photograph and the person depicted in the photograph were one and the same, is relevant as evidence tending to make more probable that the Defendant was the person who was utilizing his cell phone during this time period. *See* Tenn. R. Evid. 401. Given the probative value of the photographs, we cannot conclude that the images

depicted in the photographs were unfairly prejudicial. *See* Tenn. R. Evid. 403. Thus, the trial court did not abuse its discretion in admitting the photographs.

The Defendant challenges the trial court's admission of a photograph of him holding a gun as irrelevant and unfairly prejudicial. He maintains that there is no proof that the gun in the photograph is the same gun used in the offenses. However, Agent Scott's inability to conclusively state that the gun in the photograph was the same gun used in the offenses does not render the photograph irrelevant. Rather, Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "The phrase 'any tendency' in Rule 401 represents a conscious decision to provide that evidence is relevant if it takes the trier of fact only a small way toward resolving a proper factual issue." Neil P. Cohen, et al., *Tennessee Law of Evidence* § 4.01[4][a] (6th ed. 2011 & Supp. 2018). A Smith & Wesson black and silver .40 caliber pistol was used to shoot and kill Mr. Ike and was found at the scene of the accident involving the Defendant, Mr. March, and Mr. Beverly. Mr. Beverly testified that the Defendant had possession of the black and silver pistol and used it to abduct him. Prior to the shooting of Mr. Ike, the Defendant sent a text message to his wife, stating that he was with "his 40." Agent Scott testified that the black and silver gun that the Defendant was holding in the photograph was consistent with the black and silver gun used in the commission of the offenses. We conclude that the photograph was relevant to the issue of the Defendant's possession of the firearm used in the offenses.

To be excluded under Tennessee Rule of Evidence 403, the prejudicial effect of the photograph must "substantially outweigh" its probative value. *See* Tenn. R. Evid. 403. "Clearly, Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence." *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). "'Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.'" *Id.* at 757-58 (quoting *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)). While a photograph of the Defendant's holding a firearm may have some prejudicial effect, we cannot conclude that the Defendant has satisfied his burden of establishing that the prejudicial effect "substantially outweigh[s]" its probative value. Accordingly, the trial court did not abuse its discretion in admitting the photograph.

Finally, the State entered into evidence the extraction report from the Defendant's cell phone that included photographs of the Defendant with dates spanning from the beginning of June of 2012 to the day of the offenses. Photographs dated prior to the end of July of 2012 when the Defendant first began sending text messages searching for Mr.

Ike are not relevant to the issue of whether the Defendant was the person who was utilizing his cell phone between the end of July until the time of the offenses. Since the photographs are not relevant, the trial court erred in admitting them. *See* Tenn. R. Evid. 401. Nevertheless, the Defendant does not specifically challenge the admission of every photograph in the report prior to the end of July. The photographs which the Defendant challenges are copies, close-ups, or similar to the photographs that were properly admitted at trial. In light of the other evidence presented at trial, we conclude that the erroneous admission of the photographs was harmless. *See* Tenn. R. App. P. 36(b).

## X. Sentencing

The Defendant asserts that the trial court erred in imposing partial consecutive sentences. The State responds that the trial court did not abuse its discretion in imposing an effective sentence of life imprisonment plus thirty-one years. We agree with the State.

During the sentencing hearing, the Defendant presented the testimony of Ms. Tanaka McClain, his older sister. They had the same mother but different fathers. Ms. McClain stated that during their childhood, the Defendant's father was not present on a consistent basis. She recalled their mother and the Defendant's father engaging in arguments that would become physical. When the Defendant was one or two years old, his father was imprisoned and remained incarcerated for thirteen years. Ms. McClain testified that the Defendant had two sons and described him as a "great father." She described the Defendant as "quiet and laid back" and said their family members loved him. Ms. McClain asked the trial court to provide leniency to the Defendant.

According to the Defendant's presentence report, which was entered as an exhibit, the Defendant has prior convictions for driving on a suspended, canceled, or revoked license; vandalism; domestic violence; evading arrest; criminal trespass; aggravated burglary; aggravated assault; theft; and a weapons offense. The Defendant was on probation for convictions of aggravated assault and aggravated burglary when he committed the offenses in the instant case.

The trial court took the matter under advisement and subsequently entered a sentencing order. The trial court applied the following enhancement factors to all of the Defendant's convictions: (1) "The defendant has a previous history of criminal convictions of criminal behavior, in addition to those necessary to establish the appropriate range" and (13) the Defendant was released on probation when the felonies were committed. *See* T.C.A. § 40-35-114(1), (13). The trial court applied as an enhancement factor that the Defendant possessed or employed a firearm during the commission of the offense to his convictions for two counts of especially aggravated kidnapping, attempted first degree murder, and failure to appear. *See* T.C.A. § 40-35-

114(9). The trial court found that no mitigating factors applied. The trial court imposed sentences of life imprisonment for first degree murder, two years for unlawful possession of a handgun by a convicted felon, twenty-one years each for especially aggravated kidnapping resulting in serious bodily injury and especially aggravated kidnapping for ransom, nineteen years for especially aggravated kidnapping accomplished with a deadly weapon, twenty years for attempted first degree murder, ten years each for aggravated robbery and employment of a firearm during the commission of a dangerous felony while having prior felony convictions, eleven months and twenty nine days for theft, and two years for failure to appear.

In imposing consecutive sentencing, the trial court found that the following factors in Tennessee Code Annotated section 40-35-115(b) applied: (2) "The defendant is an offender whose record of criminal activity is extensive;" (4) "The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;" and (6) "The defendant is sentenced for an offense while on probation." With regard to the dangerous offender factor, the trial court found that an additional aggregate term is necessary to appreciate the seriousness of the offense and to protect the public from further serious criminal conduct by the Defendant. The trial court also found that consecutive sentencing is reasonably related to the severity of the offenses committed by the victims.

The trial court found that pursuant to Tennessee Code Annotated section 39-17-1324(e)(1), the Defendant's ten-year sentence for employment of a firearm during the commission of a dangerous felony was to be served consecutively to his twenty-one-year sentence for especially aggravated kidnapping resulting in serious bodily injury, which was the underlying felony. The trial court also ordered that the Defendant serve his twenty-one-year sentence for especially aggravated kidnapping resulting in serious bodily injury be served consecutively to his life sentence for first degree premediated murder. The trial court ordered that the remaining sentences be served concurrently, for an effective sentence of life imprisonment plus thirty-one years.

On appeal, the Defendant concedes that consecutive sentences for the offenses of employment of a firearm during the commission of a dangerous felony and especially aggravated kidnapping resulting in serious bodily injury were mandatory pursuant to section 39-17-1324(e)(1). However, the Defendant challenges the trial court's order requiring that he serve his twenty-one-year sentence for especially aggravated kidnapping consecutively to his life sentence for first degree premeditated murder.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act."

*State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). This court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The decision to impose consecutive sentences rests within the sound discretion of the trial court. *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010). The standard of review for consecutive sentencing is abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

To impose consecutive sentencing, the trial court must find by a preponderance of the evidence at least one of seven factors listed in Tennessee Code Annotated section 40-35-115(b), which includes: the defendant's "record of criminal activity is extensive"; "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high"; and "[t]he defendant is sentenced for an offense committed while on probation." T.C.A. § 40-35-115(b)(2), (4), (6). The trial court need only find one of the criteria listed in the statute to properly impose a consecutive sentence. *State v. Alder*, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001). When basing its consecutive sentencing determination on the "dangerous offender classification, the trial court must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)). Consecutive sentencing is "guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (citing T.C.A. §§ 40-35-102(1), -103(2)).

The Defendant asserts that the trial court erred in finding that the Defendant was a dangerous offender and maintains that the trial court did not find the additional factors set forth in *State v. Wilkerson*. However, the trial court did make the additional *Wilkerson* findings. Furthermore, the trial court also found that the Defendant had an extensive record of criminal activity and that he committed the offenses while on probation in accordance with section 40-35-115(b), and the Defendant does not challenge these findings.

Rather, the Defendant asserts that the sentence violates the principles of sentencing set forth in Tennessee Code Annotated section 40-35-103(2) & (4) because the aggregate sentence is greater than that deserved for the offenses committed and that the sentence is not the least severe measure necessary to achieve the purposes for which the sentence is imposed. In imposing the sentence, the trial court considered the facts and circumstances of the offenses, the presentence report, and the principles of sentencing. The Defendant has not demonstrated that his aggregate sentence resulted from the application of an incorrect legal standard, an illogical conclusion, a clearly erroneous assessment of the evidence, or reasoning that has perpetuated an injustice. We conclude that the trial court did not abuse its discretion in imposing partial consecutive sentences.

## CONCLUSION

We conclude that the trial court erred in denying the Defendant's motion to sever the offenses and that the error is not harmless as to the Defendant's conviction for first degree premediated murder. Thus, we reverse the Defendant's conviction for first degree premeditated murder and remand to the trial court for a new trial on that charge. We also conclude that the evidence is insufficient to support the theft conviction. Therefore, we reverse the theft conviction and dismiss the charge. While we have concluded that there were other errors in the admission of evidence at trial, the individual errors do not warrant relief, and the Defendant does not argue cumulative error on appeal. Thus, the trial court's judgments are otherwise affirmed.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE